UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID WALBY as Personal
Representative of the ESTATE OF
BENJAMIN WALBY, deceased,                  Case No.:
                                           Hon.
        Plaintiff,

vs.

CITY OF HANCOCK,
CITY OF HOUGHTON,
HOUGHTON COUNTY,
SCOTT WUEBBEN,
ALAN JURMU,
NATHAN KINNUNEN,
DYLAN GRENTZ,
PETER DEKRYGER,
BRADEN KNOOP,
SGT. JEREMY HILL,
BROCK POYHONEN,
HALEY BIANUCCI,
JENNIFER HASTREITER, and
BLAKE FRANTTI,

        Defendants.

---

JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
Fax: (248) 355-5148
j.harrignton@fiegerlaw.com
g.felty@fiegerlaw.com

---

**<u>PLAINTIFF'S COMPLAINT</u>**

Plaintiff, ESTATE OF BENJAMIN WALBY, by its Personal Representative DAVID WALBY, through the estate's attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., states the following for its Complaint against the above-named defendants.

## A. **OVERVIEW**

1.    This case involves the tragic and wrongful death of Benjamin Walby.

2.    Mr. Walby was a twenty-two-year-old high school valedictorian who had gone on to study at Michigan Technological University and was preparing to graduate with his bachelor's degree.

3.    His death arose from his interactions with the named police officers outside of his apartment on March 23, 2024.

4.    Mr. Walby was suffering from a mental illness.

5.    He was not under the influence of drugs or alcohol.

6.    A neighboring apartment resident called police dispatch shortly before 2:30 a.m. and reported that he heard banging and incoherent yelling coming from an apartment upstairs.

7.    Defendants SCOTT WUEBBEN, NATHAN KINNUNEN, DYLAN GRENTZ and ALAN JURMU, representing three different

police agencies, responded to the noise complaint at approximately 2:32 a.m.

8. The officers did not have any reason to believe that BENJAMIN WALBY, whose identity was yet unknown to them, had committed a crime or posed any danger to them or others.

9. The officers heard nonsensical yelling coming from inside the apartment as they approached its door and had every reason to believe that Mr. Walby was suffering from a mental disorder.

10. Rather than offering compassion and assistance by telling Mr. Walby that they were there to help, they drew their guns and tasers and escalated.

11. The police officers were not trained in proper methods of responding to calls involving mentally ill persons.

12. Their respective departments had not implemented specialized training, nor did they provide real-time clinical support or alternative response models for mental health crisis calls.

13. Consequently, the officers ignored their constitutionally required responsibilities of continued deescalation, preservation of life, and the avoidance of force.

14. Mr. Walby was unarmed.

15.    All officers knew that he was unarmed and had no reason to believe that he was armed with any weapon.

16.    Ben ran out of his apartment, down the stairs, and onto the sidewalk into the freezing cold, at approximately 2:35 a.m., wearing only his undershorts.

17.    Ben was visibly bleeding from wounds over his body that were later determined to be superficial.

18.    Nevertheless, the decedent was immediately tased in dart-probe mode by Defendant KINNUNEN (using a TASER 7) and Defendant WUEBBEN in drive-stun mode (also using a TASER 7).

19.    Ben was then tackled to the ground by Defendant GRENTZ, where he was tased again in drive-stun mode by Defendant WUEBBEN.

20.    Defendants State Trooper PETER DEKRYGER and State Trooper BRADEN KNOOP arrived as the tasing was underway.

21.    They were later followed by Defendants JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI, who all arrived at the scene.

22.    The decedent was repeatedly tased in drive stun mode and dart-probe mode before and after being handcuffed.

4

23.    Mr. Walby was hogtied, tased again, and continuously held to the ground on his stomach by the defendants.

24.    None of the defendants intervened to stop the excessive force that was being applied.

25.    None of the defendants timely sought medical attention for the decedent.

26.    BENJAMIN WALBY's heart stopped and he stopped breathing as a direct result of the force being applied.

27.    He became lifeless outside of his apartment.

28.    Defendants WUEBBEN, KINNUNEN, GRENTZ, DEKRYGER, KNOOP, HILL, POYHONEN, BIANUCCI, HASTREITER, and FRANTTI eventually laid Mr. Walby into the back seat of Defendant WUEBBEN's police car, handcuffed behind the back, and Defendant FRANTTI drove him to the Portage Health Emergency Department as he lay on his stomach.

29.    Hospital personnel were able to get Mr. Walby's heart beating after aggressive CPR; however, due to a lack of oxygen to the brain ("global hypoxic ischemic encephalopathy"), doctors did not believe that Mr. Walby had a chance of recovering any meaningful neurologic function following his cardiac arrest.

30.    They were correct; Benjamin Walby died several days later, on April 4, 2024, as a result of the injuries inflicted by the officers.

31.    None of the responding officers ever reasonably feared for their lives or safety.

32.    The direct actions of the officers, including the officers' use of unreasonable force by causing asphyxiating pressure to be applied to his body and tasing him, their failure to intervene or properly supervise, and their failure to seek readily available medical attention for the decedent, who was suffering serious medical conditions, caused BENJAMIN WALBY to stop breathing, go into cardiac arrest, suffer hypoxic ischemic encephalopathy, and ultimately die.

### B. **PARTIES AND VENUE**

33.    BENJAMIN WALBY is deceased; he died as a result of the encounter.

34.    The plaintiff, DAVID WALBY, is the decedent's father.

35.    Plaintiff DAVID WALBY is a Michigan resident who brings this action as Personal Representative of the Estate of Benjamin Harrison Walby, having been duly appointed by the Ogemaw County Probate Court on April 29, 2024.

36.    Defendant CITY OF HANCOCK is a municipal corporation located in Houghton County, Michigan that operates the Hancock Police Department.

37.    Defendant CITY OF HOUGHTON is a municipal corporation located in Houghton County, Michigan that operates the Houghton Police Department.

38.    Defendant HOUGHTON COUNTY is a governmental entity in the state of Michigan that operates the Houghton County Sheriff's Department.

39.    Defendant SCOTT WUEBBEN was at all material times a police officer, who was acting under color of law and within the scope of his employment by the City of Hancock Police Department, which is in Houghton County, Michigan.

40.    Defendant SCOTT WUEBBEN is being sued in his individual capacity.

41.    Defendant ALAN JURMU was at all material times a police officer, who was acting under color of law and within the scope of his employment by the City of Houghton Police Department, which is in Houghton County, Michigan.

42.    Defendant ALAN JURMU is being sued in his individual capacity.

43.    Defendant NATHAN KINNUNEN was at all material times a sheriff's deputy, who was acting under color of law and within the scope of his employment by the Houghton County Sheriff's Office, which is a division of the County of Houghton, Michigan.

44.    Defendant NATHAN KINNUNEN is being sued in his individual capacity.

45.    Defendant DYLAN GRENTZ was at all material times a sheriff's deputy, who was acting under color of law and within the scope of his employment by the Houghton County Sheriff's Office, which is a division of the County of Houghton, Michigan.

46.    Defendant DYLAN GRENTZ is being sued in his individual capacity.

47.    Defendant PETER DEKRYGER was at all material times a Michigan State Trooper, who was acting under color of law and within the scope of his employment by the Michigan State Police, which is a division of the State of Michigan.

48.    Defendant PETER DEKRYGER is being sued in his individual capacity.

8

49.    Defendant BRADEN KNOOP was at all material times a Michigan State Trooper, who was acting under color of law and within the scope of his employment by the Michigan State Police, which is a division of the State of Michigan.

50.    Defendant BRADEN KNOOP is being sued in his individual capacity.

51.    Defendant JEREMY HILL was at all material times a police sergeant, who was acting under color of law and within the scope of his employment by the City of Houghton Police Department, which is in Houghton County, Michigan.

52.    Defendant JEREMY HILL is being sued in his individual capacity.

53.    Defendant BROCK POYHONEN was at all material times a sheriff's deputy, who was acting under color of law and within the scope of his employment by the Houghton County Sheriff's Office, which is a division of the County of Houghton, Michigan.

54.    Defendant BROCK POYHONEN is being sued in his individual capacity.

55.    Defendant HALEY BIANUCCI was at all material times a police officer, who was acting under color of law and within the scope

9

of her employment by the Michigan Technological University Department of Public Safety and Police Services, which is a division of the State of Michigan.

56.   Defendant HALEY BIANUCCI is being sued in her individual capacity.

57.   Defendant JENNIFER HASTREITER was at all material times a police officer, who was acting under color of law and within the scope of her employment by the Michigan Technological University Department of Public Safety and Police Services, which is a division of the State of Michigan.

58.   Defendant JENNIFER HASTREITER is being sued in her individual capacity.

59.   Defendant BLAKE FRANTTI was at all material times a sheriff's deputy, who was acting under color of law and within the scope of his employment by the Houghton County Sheriff's Office, which is a division of the County of Houghton, Michigan.

60.   Defendant BLAKE FRANTTI is being sued in his individual capacity.

61.   Upon information and belief, all defendants reside in and/or do business within the Western District of Michigan.

10

62.    Venue lies in the Western District of Michigan pursuant to
28 U.S.C. §131(b)(1) and (2).

### C. <u>JURISDICTIONAL ALLEGATIONS</u>

63.    This is a civil action for monetary damages being brought
pursuant to 42 U.S.C. §1983, which guarantees citizens of the United
States an action at law against any person who, acting under color
of law, deprives them of their rights secured by the United States
Constitution.

64.    The case is also brought pursuant to the Michigan
Wrongful Death Act, MCL §600.6922, and the laws and common law
of the State of Michigan.

65.    Plaintiff seeks all compensatory damages allowable for a
violation of 42 U.S.C. §1983 and punitive damages for the reckless
and callous indifference exhibited by the individual defendants to the
decedent's constitutional rights in addition to costs, interest, expert
fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C.
§1988.

66.    Plaintiff seeks all additional damages otherwise allowed at
common law or by statute, and those damages allowed by the

Michigan Wrongful Death Statute, MCL §600.6922, that include but

are not necessarily limited to:

      a.  Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

      b.  Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

      c.  Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

      d.  Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

      e.  Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

67.  The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

68.  This Court has jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, and 28 U.S.C. §1367.

## D. **LEGAL FRAMEWORK**

### 1. Right of Action

69.    The Fourth Amendment to the United States Constitution guarantees citizens the right to be secure in their persons from unreasonable seizures, which includes the right to be free from unreasonable or excessive force during an arrest.

70.    The Fourteenth Amendment to the United States Constitution guarantees pretrial detainees the right to adequate medical care.

71.    Citizens have a right to bring an action against governments and governmental employees for the violation of their rights.

> "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

### 2. Use of Force in General

72.    The Fourth Amendment protects citizens from excessive force by law enforcement officers.

73.    It is clearly established that, when a police officer applies force against a citizen, the level of force used must be objectively reasonable in light of the facts and circumstances that were known to the officer.

74.    Therefore, seizing officers owe citizens the constitutional duty to limit the use of force during detention to what is reasonable and proportional according to the totality of the circumstances; and, to reduce the degree of force used as the need diminishes.

75.    Seizing officers must use the least amount of force necessary to accomplish lawful law enforcement objectives.

76.    Officers are liable when their unconstitutional use of excessive force violates a right that was clearly established.

77.    Rights are clearly established by decisions of the United States Supreme Court, the decisions of courts in this circuit, the decisions of courts in other circuits, laws, and accepted police policies and procedures.

### 3. Use of Force Against the Mentally Ill

78.    Studies have shown that individuals with serious mental illness are 16 times more likely than the general public to be killed during a police encounter.

14

79.    Studies have also shown that police officers are more likely to use force; and are more likely to use higher levels of force, upon the mentally ill, than the general public during a police encounter.

80.    Police officers who are untrained in distinguishing between persons who are under the influence of drugs or alcohol and those suffering from mental illness often mistake the behavior of the mentally ill as intoxication.

81.    Consequently, untrained police officers regularly mistake the behavior of the mentally ill as non-compliance, resulting in a higher likelihood of the use of force and the escalation of police force.

82.    This concept has been accepted in the jurisprudence of this circuit.

> "[B]ehavior that ordinarily seems threatening may present a lower risk of harm if the officer has reason to believe that the behavior is the symptom of a mental condition." *Palma v. Johns*, 27 F.4th 419, 437 (6th Cir. 2022).

83.    This circuit has also identified clear signs of a mental condition that would give an officer reason to believe that a person's behavior is the symptom of a mental condition, such as being unclothed, acting erratically, and making incoherent statements. *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).

15

84.   In such a situation, the reasonable officer is required to accommodate the person believed to be suffering from a mental disorder by taking steps to deescalate the situation before resorting to force.

85.   Recognition of the duty to accommodate by deescalation is consistent with the accommodation requirements of the Americans with Disabilities ACT (ADA), which provides in material part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

86.   Consequently, it is clearly established in this circuit that a reasonable police officer encountering a person with a mental illness would determine whether and how to deescalate a situation before resorting to force, which may include retreating and monitoring the person. *Martin, supra*, 712 F.3d at 958-959 (6th Cir. 2013); *Palma, supra*, 27 F.4th at 438; *Thomas v. City of Columbus*, 854 F.3d 361, 366-367 (6th Cir. 2017).

87.   In pursuing deescalation, reasonable police officers understand that physical posture, tone of voice, and eye contact

16

effect how individuals suffering from a mental health crisis will perceive and react to police presence and that such persons may not comprehend commands due to hallucinations or delusional behavior.

88.    Police agencies have a constitutional duty to train and supervise their officers regarding deescalation and the level of force that may be permissibly used to safely detain a person who is mentally ill, experiencing a mental health crisis, or is under the influence of a controlled substance or alcohol.

89.    Proper training includes but is not limited to educating officers to make a determination whether a person is mentally ill, is experiencing a mental health crisis, or is under the influence of drugs or alcohol; devising an intervention strategy; requesting the presence of an officer trained in crisis intervention; taking time to assess the situation; recognizing that the subject may be overwhelmed by thoughts, beliefs, or voices; recognizing that a subject's delusions or hallucinations are very real to them; understanding that a rational discussion may be impossible; speaking simply and moving slowly; announcing actions before taking them; obtaining necessary equipment and resources; employing strategies to calm the situation; providing reassurance to the subject that the officers are there to

17

help; being friendly, patient and encouraging; attempting to gain voluntary compliance; using deescalation techniques; being aware that a uniform and weapons may frighten the subject; reassuring the person that no harm is intended; and obtaining immediate emergency mental and/or medical assistance.

90.    The purpose of such training is to avoid injury or death to either the officer or the subject person.

91.    Upon information and belief, Defendant CITY OF HANCOCK did not have a policy regarding crisis intervention or provide its officers training in the subject matter.

92.    Instead, the CITY OF HANCOCK had an unconstitutional official policy that permitted the use of force upon persons suffering from a mental health crisis without first using deescalation techniques.

93.    Upon information and belief, Defendant HOUGHTON COUNTY did not have a policy regarding crisis intervention or provide its officers training in the subject matter.

94.    Instead, HOUGHTON COUNTY had an unconstitutional official policy that permitted the use of force upon persons suffering

18

from a mental health crisis without first using deescalation techniques.

95.    Defendant CITY OF HOUGHTON had a Crisis Intervention Incident policy that its police officers were required to follow when they interacted with a person suffering from mental illness.

96.    The CITY OF HOUGHTON policy instructed its officers "that mental health issues, mental health crises, and unusual behavior are not criminal offenses" and that persons suffering from such conditions might benefit from treatment as opposed to arrest and incarceration.

97.    The CITY OF HOUGHTON policy informs its officers that the symptoms of mental disorders are similar to those of a person who is under the influence of drugs or alcohol and requires its officers to make initial assessments and undertake certain actions that include:

> a. Determining whether a mental health crisis might be a factor,
>
> b. Requesting specialized resources,
>
> c. Using conflict resolution and deescalation techniques,
>
> d. Turning off flashing lights, bright lights, or sirens,

e. Knowing that the individual might not understand commands or appreciate the consequences of his or her actions or inactions, and to

f. Consider and employ alternatives to force.

98.  Consistently with what has been held to be a constitutional duty in this circuit, the CITY OF HOUGHTON policy requires deescalation and understanding that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis.

99.  The CITY OF HOUGHTON policy instructs its police officers NOT to do any of the following:

a. Use stances or tactics that can be interpreted as aggressive,

b. Allow others to interrupt or engage the person,

c. Corner the person, or

d. Argue, speak with a raised voice, or use threats to obtain compliance.

100.  The CITY OF HOUGHTON policy also requires a supervisor to respond to the scene of any interaction with a person in crisis who is required to:

a. Secure appropriate resources,

b. Closely monitor any use of force, including the use of restraints, and ensure that those subjected to the

20

use of force are provided with timely access to medical care, and to

c. Consider strategic disengagement.

### 4. Taser Usage

101.  "TASER" is a trade name for an electronic control weapon (ECW) that is manufactured and supplied by TASER international.

102.  Such devices are also referred to as electro muscular disruption devices, conducted energy devises, conducted electrical weapons, and other similar names.

103.  Such weapons are designed to subdue a person by electrifying them.

104.  They are deployed in one of two ways: (1) dart-probe mode and (2) drive-stun mode.

105.  Dart-probe mode involves shooting two darts into a person that are connected to the gun by wires that cause an electrical circuit to pass through the subject's body resulting in neuromuscular incapacitation, which means that the person loses control of their muscles and the muscles involuntarily contract or tense up.

106.  Drive-stun mode involves forcefully driving metal probes located on the gun itself into the subject's body, pulling the trigger and causing a painful electrical shock.

21

107.  The State of Michigan requires police officers to be trained in the use of an ECW to carry such a weapon. MCL §750.224a.

108.  ECW's have been held to be dangerous per se because they are designed to cause excruciating pain.

109.  It is clearly established that the use of an ECW is a proportional use of force only when deployed upon a subject who is so violent so as to endanger responders, such that a reasonable officer would perceive some immediate danger that could be mitigated by using the taser.

110.  The gratuitous or excessive use of a taser violates the clearly established right to be free from the use of excessive force.

111.  It is clearly established that an officer may not use a taser against a person who has been subdued, incapacitated, or neutralized.

112.  It is clearly established that an officer may not continue to use force with blows or intermediate weapons after a person is handcuffed and hogtied.

113.  Established and accepted police procedures and policies related to ECW application include, but are not limited to the following:

22

a. ECW applications longer than 15 seconds, continuously or cumulatively, may cause serious injury or death, and are excessive,

b. Persons who are suffering a mental health crisis or are under the influence of drugs or alcohol are at a greater risk of serious injury or death from ECW application than those who are not,

c. Application of more than one ECW simultaneously with another is excessive force,

d. Application of an ECW more than three times or longer than 15 seconds is excessive,

e. An ECW should not be used in drive-stun mode to achieve pain compliance, particularly in those who are suffering a mental health crisis or are under the influence of drugs or alcohol due to a mind-body disconnect,

f. Police officers must use a restraint technique on persons subjected to the application of an ECW that does not impair respiration,

g. Officers who use ECWs must be trained in the use of the weapon by a properly accredited instructor in addition to receiving training by the manufacturer of the weapon,

h. ECWs are not tools of convenience; but rather, are weapons of need,

i. The use of an ECW is excessive if more effective and less risky alternative methods of force are available,

j. A warning should be given to deescalate and achieve verbal compliance before an ECW application,

k. Use of an ECW in drive-stun mode causes body movement that is routinely mistaken as non-compliance,

l. Use of an ECW in drive-stun mode serves no purpose other than causing pain and should only be used to

23

complete an electrical circuit if a probe is ineffective or becomes dislodged or to create a distance between the officer and the subject,

m. Use of an ECW in drive stun mode is likely to escalate the situation by causing rage in the subject,

n. Sufficient time must elapse between ECW applications to determine if the person will comply,

o. Use of an ECW on a person is excessive if there is no threat of imminent harm to the officer or others,

p. An ECW should not be used for flight or resistance alone,

q. Use of an ECW on a person who is subdued or incapacitated is excessive, and

r. ECWs should not be used on a person who is handcuffed.

114. Taser International, Inc., the manufacturer of the electronic control weapons material to this action, has recognized and warned its police consumers to minimize total ECW exposure in accordance with accepted police policies and practices to avoid injury and death.

115. Taser International has also warned its consumers that their ECW's should not be used to achieve pain compliance.

116. Defendant CITY OF HANCOCK maintained an unconstitutional policy that allowed its officers to use ECW's for the purpose of accomplishing any lawful arrest, which permits its officers

to use a taser even when the officer has no reasonable fear of danger to himself, herself, or others.

117. Defendant CITY OF HANCOCK'S ECW policy does require that its officers be trained annually by a certified electro muscular disruption device instructor before using such a device.

118. Based upon documentation provided by the CITY OF HANCOCK, Defendant SCOTT WUEBBEN was issued a training certificate for the TASER 7 CEW that he used upon the decedent on August 25, 2023, that is signed by Sgt. Darick Coponen, of the Hancock Police Department.

119. Based upon documents provided by the CITY OF HANCOCK, and upon information and belief, Sgt. Darick Coponen was not certified to train officers in the use of the TASER 7.

120. Defendant CITY OF HOUGHTON also had a policy regarding the use of ECW's or conducted energy devices that required its officers to be certified in the use of the weapon they carried.

121. Upon information and belief and based upon documents provided by the CITY OF HOUGHTON, its officers, including Defendant ALAN JURMU, were not trained by a person certified to teach the use of the taser.

122. The CITY OF HOUGHTON's policy purports to constitutionally limit taser use to the control of a violent or potentially violent person but unconstitutionally permits taser usage for physical resistance alone.

123. The CITY OF HOUGHTON's policy does recognize many of the concepts that are required of police officers to constitutionally use a TASER; and, in that regard directs its officers to do the following when using a TASER:

   a. Avoid using an ECW on a person who is handcuffed or otherwise restrained,

   b. Use the drive-stun mode only to complete a circuit or to create a distance between the officer and a subject,

   c. Refrain from using more than one taser on a person at the same time,

   d. Complete only one standard cycle and give the subject time to respond before using the taser again,

   e. Consider whether the person to be tased has the ability to understand and comply,

   f. Consider tactics other than taser usage,

   g. To use other techniques to control and restrain an individual, and

   h. Give a verbal warning before each taser use to allow an individual time to comply with instructions.

26

124.   The City of Houghton policy further provides that a taser is not to be used for flight alone.

125.   The Michigan State Police also adopted an electro-muscular disruption technology device policy.

126.   The Michigan State Police policy prevented its officers from employing tactics that the defendants used in this matter, including:

> a.  Using an ECW in a punitive manner,
>
> b. Using such a device on a handcuffed or secured person, and
>
> c. Using more than one device at the same time.

127.   Defendant HOUGHTON COUNTY had, upon information and belief and based upon documents provided, an official policy that provides "electrical stun weapons shall not be carried."

128.   Contrary to the county's official policy, Defendant NATHAN KINNUNEN carried a taser.

129.   HOUGHTON COUNTY's general policy regarding what it calls "intermediate weapons," that would include the prohibited taser, further provides that "no officer shall carry an intermediate weapon in which he/she has not successfully completed training."

130.   Upon information and belief and based upon documents provided, Defendant KINNUNEN did not successfully complete

27

training in the unauthorized TASER 7 that he used on March 23, 2024, until after this incident, on April 7, 2024.

131. Furthermore, documents produced by Defendant HOUGHTON COUNTY reveal the county's continuous and systematic failure to train and supervise its officers in the use of ECW's, as evidenced by its acquiescence and approval of ECW use in incidents that include, but are not necessarily limited to the following:

     a. Deputy's use of a taser in conjunction with MSP on October 19, 2019, because the subject passively resisted being placed in a police car by tensing up while handcuffed,

     b. Deputy's use of a taser on September 6, 2020, at intake in the jail where the detainee threw a fake punch at the deputy, who did not reasonably believe that he was in danger, the detainee made no further threatening gestures, but the deputy drew his taser and then shot the subject in dart-probe when the detainee did not sit down as instructed,

     c. Deputy's use of a taser on April 4, 2021, upon a subject who pulled away from being handcuffed,

     d. Deputy's use of a taser on May 5, 2021, upon an individual known to be suffering from a mental health issue who would not come out of the bathroom, where the door was kicked in and the subject was hiding in the bathtub behind a shower curtain,

     e. Deputy's use of a taser on April 5, 2022, upon an individual who failed to give his name and turned to walk into his house,

28

f.  Deputy tasing a person during a wellness check on May 15, 2022, who was known to be suffering from a mental illness and was not suspected of a crime who allegedly resisted an unlawful handcuffing,

g.  Deputy's tasing of an inmate on July 24, 2022, who was lying face down on the floor and objected to having a spit mask pulled over his head,

h.  Deputy tasing an individual in the presence of Defendant POYHONEN on September 17, 2022, who did not put his hands behind his back,

i.  Defendant POYHONEN drive-stunning a subject for failing to get out of his automobile on October 6, 2022,

j.  Defendant POYHONEN tasing a subject for failing to put his hands behind his back on October 25, 2022,

k.  Deputy tasing a person suspected of drunk driving on May 30, 2023, in the presence of Defendant JURMU for taking his jacket off,

l.  Defendant POYHONEN's use of drive-stun on an inmate on September 23, 2023, for failure to follow a command when no one was in danger,

m. Deputies' use of drive-stun four times upon an inmate on November 11, 2023, for failure to follow commands when no one was in danger in Defendant POYHONEN's presence, and

n.  Deputy's use of dart-probe mode on January 6, 2024, through a cell door and into a naked inmate for failing to get dressed in the presence of Defendant POYHONEN and the department's taser instructor.

## 5. Positional and Compressional Force

132.  Clearly established law prohibits putting an individual in a position that would result in substantial or significant pressure on a person's back while the person is detained in a face-down, prone position.

133.  The use of such tactics, known as positional and compressional force, are excessive force because they can cause asphyxia, or a person to stop breathing.

134.  Police agencies have a constitutional duty to train and supervise their officers regarding the risk of weight force compressional asphyxia and positional asphyxia.

135.  The dangers of positional asphyxia or weight force compressional asphyxia are well-known to all municipal defendants and were well-known before the Walby incident.

136.  Significant trade press articles have reported the dangers of positional asphyxia and weight force compressional asphyxia.

137.  The Michigan State Police, which employed Defendants DEKRYGER and KNOOP, has instructed its troopers in the risk of positional asphyxia.

138.  The Michigan State Police has instructed its troopers that positional asphyxia can cause a person to stop breathing resulting in in-custody deaths.

139.  The Michigan State Police informed their officers that individuals who are obese, under the influence, or are suffering from a mental health condition are at a greater risk of positional asphyxia than those who are not.

140.  State Troopers such as Defendants DEKRYGER and KNOOP are required to be aware of positional asphyxia and to ensure that detainees are not held face down with their hands behind their back.

141.  State Troopers such as Defendants DEKRYGER and KNOOP are required to ensure that detainees are transported in an upright position and are not transported while lying on their stomachs with their hands behind their back.

142.  State Troopers are expressly prohibited from "hogtying" detainees, defined by the Michigan State Police as "the practice of restraining a resistive suspect's hands and ankles and securing them together behind the suspect's back while placing the prisoner in a

31

prone position," because it is known that "hogtying" causes positional asphyxia.

143.   It is clearly established in the Sixth Circuit that the practice of hogtying a mentally impaired detainee, thereby subjecting the person to asphyxiating conditions, is an excessive use of force.

144.   Upon information and belief and based upon documents provided by the CITY OF HANCOCK, Defendant CITY OF HANCOCK had an official policy or custom that allowed its officers to hogtie mentally ill persons and hold them in the prone position.

145.   The hogtying of Mr. Walby was, in and of itself, a constitutional violation.

146.   Upon information and belief and based upon documents provided by HOUGHTON COUNTY, Defendant HOUGHTON COUNTY had an official policy or custom that allowed its officers to hogtie mentally ill persons and hold them in the prone position.

147.   Defendant CITY OF HOUGHTON had a policy that stated that persons in leg restraints should be transported to a jail or hospital in an upright position and secured with a seatbelt.

148.   The policy further states that persons being transported to a hospital or jail in leg restraints "shall not" be placed on their

stomach for a prolonged period of time because that could reduce the person's ability to breathe.

149.   However, Defendant CITY OF HOUGHTON had no policy prohibiting its officers from holding detainees at the site of detention while hogtied in the prone position and did not train its officers regarding positional or weight-force compressional asphyxia.

150.   To the contrary, Defendant CITY OF HOUGHTON's officers were advised by policy that, "unless arrested, the use of restraints on detainees should continue only for as long as is reasonably necessary to ensure the safety of officers and others," and that "auxiliary restraint devices, including leg irons and similar devices [such as hogties] are intended for use during long-term restraint or transportation," because "[t]hey provide additional security and safety without impeding breathing while permitting adequate movement, comfort and mobility."

151.   Consequently, Defendant CITY OF HOUGHTON"s policy permitted the use of hogtying and detaining a hogtied and arrested individual in the prone position for a prolonged period of time and is unconstitutional.

**6. Duty to Intervene**

152.  An officer owes a constitutional duty to intervene to prevent a constitutional violation where the officer has reason to know that a constitutional violation is occurring or is about to occur and the officer has the opportunity and the means to prevent the harm from occurring.

153.  In addition, an officer who supervises the use of excessive force by another officer is liable for the use of excessive force by that other officer.

154.  A supervisory officer is individually liable for his or her own unconstitutional actions and is liable in his or her supervisory capacity for authorizing, approving or knowingly acquiescing to the conduct of a subordinate officer that causes a constitutional injury.

**7. Deliberate Indifference to Medical Needs**

155.  Police officers owe a constitutional duty to their detainees to obtain immediate medical attention if they are suffering from a serious medical condition and are liable for their deliberate indifference to that need.

156.  It is clearly established in the Sixth Circuit that an officer is liable for delaying medical intervention to a detainee suffering from

34

an objectively serious medical condition where the officer is aware of the medical need and recklessly fails to act.

157.  It is clearly established in the Sixth Circuit that a person has an obvious serious medical need where the person is placed face down on the ground while handcuffed behind the back under asphyxiating conditions.

### E. **FACTUAL ALLEGATIONS**

158.  Benjamin Walby lived in an upper apartment located at 323 Hancock St., Hancock, Michigan (locally known as the St. Peter and Paul Lutheran Church), on March 23, 2024.

159.  A resident of another unit telephoned the Negaunee Regional Communications Center at approximately 2:27 a.m. and complained that there was a lot of noise coming from Mr. Walby's apartment that involved banging and incoherent yelling by a man.[*]

160.  City of Hancock Police Officer, Defendant SCOTT WUEBBEN, was dispatched to respond to the reported noise complaint.

---

[**]Times are approximate because five police agencies, a dispatch office, and 11 individual officers were immediately involved in the police response. Records report that the times of the numerous recording devices being utilized were not synchronized.

161.   Defendant WUEBBEN was met at the scene by City of Houghton Police Officer, Defendant ALAN JURMU; and Houghton County Sheriff Deputies, Defendants NATHAN KINNUNEN and DYLAN GRENTZ, at approximately 2:32 a.m.

162.   Officers from the City of Hancock Police Department, the City of Houghton Police Department, the Houghton County Sheriff's Department, the Michigan State Police, and the Michigan Tech Department of Public safety regularly and customarily responded to calls of the other agencies and provided observation, assistance, or back-up.

163.   Defendants WUEBBEN, JURMU, KINNUNEN and GRENTZ knew that there had not been any prior calls from or police responses to the apartment.

164.   The defendants had no reasonable basis to believe that the subject, later determined to be the decedent, BENJAMIN WALBY, had committed any crime.

165.   The decedent was not under the influence of drugs or alcohol.

166.   The four defendants approached Mr. Walby's closed apartment door at approximately 2:33 a.m.

36

167. Defendant WUEBBEN knocked on the door.

168. The defendants heard incoherent yelling by an unknown man coming from inside the apartment including "kill me," "shoot me," "I have the power," and "I don't exist."

169. The defendants also heard the decedent bang into the wall or door.

170. The defendants heard words and observed behavior that both this circuit and typical police crisis intervention policies have identified as behavioral characteristics that would have put a reasonable police officer on notice that Mr. Walby was suffering from a mental health crisis.

171. Such behavior includes delusional statements, suicidal statements, nonsensical speech, preoccupation with death, phrase repetition, loud speech, argumentative or belligerent speech, and unusual behavior.

172. Though any reasonable officer would have suspected that the yet unidentified man was suffering a mental health crisis and no defendant had reasonable suspicion to believe that he had committed a crime, the four defendants did not employ crisis intervention techniques and deescalation.

173.  Rather, the four defendants escalated.

174.  Defendant WUEBBEN unholstered his Taser and pointed the device at the apartment door as Defendant JURMU drew his pistol and shined a bright flashlight through the illuminated hallway and onto the door.

175. Defendants GRENTZ and KINNUNEN took positions further away from the apartment door and closer to the exit of the apartment building, that was down a flight of stairs.

176.  Defendant KINNUNEN also drew his TASER.

177.  The door to the apartment was opened and the four responding officers observed the decedent standing in the door wearing only his undershorts.

178.  The officers saw that the decedent had cuts about his body and that he was bleeding.

179.  Though the cuts later proved to be superficial, they were objectively apparent and the individual defendants (both those who were present when Mr. Walby appeared at the door and those who arrived later), took note of the lacerations and/or commented on-site that he had cuts all over his body, including his stomach and wrists.

38

180.   None of the individual defendants reasonably believed that Mr. Walby was armed with a weapon because the decedent was not carrying a weapon and could not conceal a weapon in his boxer shorts.

181.   Any reasonable police officer would have known that the situation involved a virtually naked unarmed man, who was not suspected of committing any crime, and who was in serious need of both mental health treatment and medical intervention.

182.   Any reasonable policer officer would have known that the aggressive posture that the defendants had taken was likely to result in flight.

183.   The decedent, who was not told that he was under arrest, ran out of his apartment at approximately 2:35 a.m., much as a reasonable officer would have anticipated from a nearly naked delusional person with a bright light shining in his eyes and a taser and a gun pointing at him.

184.   Mr. Walby fled but did not make any threats toward the officers.

185.   He ran down the flight of stairs toward the exit of his building, outside, and into the freezing cold.

186.  The defendants ran away from Mr. Walby but headed in the same direction as his path, toward the outside of the building that opened to the sidewalk.

187. Defendants GRENTZ and KINNUNEN reached the sidewalk before Mr. Walby and before Defendants WUEBBEN and JURMU.

188. Defendants WUEBBEN and JURMU followed closely behind Defendants GRENTZ and KINNUNEN, who stopped outside, near the exit of the building.

189.  Though police records associated with the timing of this incident are conflicting, upon information and belief, Defendant KINNUNEN fired his first of two taser cartridges in dart-probe mode and struck Mr. Walby at approximately 2:35:46, causing neuromuscular incapacitation as Defendant WUEBBEN simultaneously tased the decedent in drive-stun mode.

190.  The decedent's muscles contracted and he fell to the ground onto the sidewalk on his stomach, knocking Defendant JURMU to the ground as his arms tensed around the officer's legs.

191. Defendant KINNUNEN then fired his second taser cartridge into Mr. Walby at approximately 2:35:48 before tasing the decedent a third time at approximately 2:35:49.

192. Defendant GRENTZ tackled the decedent at approximately 2:35:50.

193. Defendant JURMU got up and walked away at approximately 2:35:51.

194. Defendant GRENTZ began forcing Mr. Walby onto his back as Defendant WUEBBEN tased him again in drive-stun mode without warning at approximately 2:35:57.

195. Defendant GRENTZ then pinned the decedent to the ground, in a cross-body wrestling maneuver, applying substantial or significant pressure across Mr. Walby's chest.

196. Mr. Walby was subdued to the ground by Defendant GRENTZ at approximately 2:36:00.

197. Defendants KINNUNEN and WUEBBEN stood beside Mr. Walby pointing their tasers at the decedent as Defendant JURMU stood over the decedent holding a flashlight.

198. Defendant JURMU said, "handcuff him, handcuff him," at approximately 2:36:05 as Michigan State Trooper Defendants

41

DEKRYGER and KNOOP sped upon the scene in their police car, lights and sirens blaring while Defendant GRENTZ had the decedent subdued upon the ground.

199.   Defendants WUEBBEN, KINNUNEN, and JURMU did not assist by attempting to handcuff Mr. Walby.

200.   The troopers did not run up to the four officers who first responded because they observed what any reasonable officer would have observed: an unarmed and virtually naked man lying on his back who was subdued by a deputy.

201.   No reasonable officer would believe that such a person surrounded by six police officers would pose a danger to anybody.

202.   Therefore, the troopers casually walked up at approximately 2:36:08 as Defendant KINNUNEN exclaimed, "if he moves, I'm tasing him."

203.   Having been held on his back for approximately 10 seconds, with Defendant GRENTZ compressing his chest, hearing sirens, and seeing flashing lights and other officers coming toward him, Ben moved and tried to roll to his side.

204. Defendant KINNUNEN, without warning or command, tasered Mr. Walby through the probes that he had previously shot into the decedent, at approximately 2:36:20.

205. Without giving Mr. Walby a warning, a command, or an opportunity to respond, Defendant KINNUNEN tasered him an additional time at approximately 2:36:28, with the blast ending 5 seconds later.

206. None of the six officers that were on site told Mr. Walby that he was under arrest or compassionately explained that they were there to help.

207. Rather, Defendant KINNUNEN told Defendant JURMU to introduce his TASER X2 into the picture at approximately 2:36:38 while Mr. Walby was being held to the ground on his back in the shape of a cross by two police officers.

208. The threat of an additional taser and more excruciating pain induced Mr. Walby to do a reverse somersault onto his stomach at approximately 2:36:39.

209. Defendant KINNUNEN responded with a taser blast for another 5 seconds at approximately 2:36:41.

43

210. Defendant JURMU, knowing Defendant KINNUNEN was already tasing the decedent, shot Mr. Walby in the leg with his taser's darts and tased him with both of his cartridges, each containing two darts.

211. One of Defendant JURMU's cartridges deployed for five seconds and the other deployed for fifteen seconds, beginning at approximately 2:36:45, while, upon information and belief, Defendant KINNUNEN again tased the decedent in drive-stun mode at the same time.

212. Defendant KINNUNEN also began applying significant pressure to the decedent's back by pushing his taser's probes between Mr. Walby's shoulder blades, thereby pushing his chest into the pavement, as he lay on his stomach.

213. Defendant KINUNNEN and/or Defendant JURMU's tasers continued to run while Mr. Walby was being handcuffed in the prone position, Defendants WUEBBEN, DEKRYGER, and GRENTZ, pressing the decedent's hands into the small of his back.

214. The tasers momentarily shut off at approximately 2:37:00.

215. At this time, the decedent was restrained and in handcuffs, lying on his stomach in the prone position with:

44

a. Defendant KINNUNEN forcefully pressing his taser into Mr. Walby's shoulder blades and

b. Defendant KNOOP twisting his boot into the decedent's right shoulder and pressing it toward the ground.

216. BENJAMIN WALBY remained in that position for about 2 ½ minutes as Defendants WUEBBEN, GRENTZ, KINNUNEN, and KNOOP stood around talking or walked about the site.

217. During that time,

a. Defendant KINNUNEN proclaimed that BENJAMIN WALBY was full of lacerations and radioed that information in to dispatch,

b. Defendant JEREMY HILL rolled up at approximately 2:37:34,

c. Defendant DEKRYGER pressed the decedent's back toward the ground,

d. Defendant JURMU stood on Mr. Walby's left ankle,

e. Defendant BROCK POYHONEN walked on site at approximately 2:38:11, after rolling in with lights and sirens blaring, and

f. BENJAMIN WALBY moaned in distress, said to himself that he was not dead yet, and attempted to reposition himself and ask for help at approximately 2:38:17 as an ambulance approached.

218. Like he had done moments earlier, at approximately 2:38:23, in response to Mr. Walby's struggled attempt to reposition himself, Defendant KINNUNEN drive-stunned the decedent, pulled

45

his taser trigger three times and tased him for at least five seconds as Mr. Walby lay on his stomach, unarmed, handcuffed, nearly naked, and now surrounded by at least eight law enforcement officers.

219.  Defendant  JURMU  simultaneously  tased  Mr.  Walby through  the  probes  that  he  had  previously  injected  into  the decedent's legs and to ensure the circuit was completed, performed a drive-stun maneuver.

220.  Despite it being a clear violation of Michigan State Police policy,  Defendants  DEKRYGER  and  KNOOP  decided  to  teach Defendants WUEBBEN, KINNUNEN, JURMU, GRENTZ, HILL, and POYHONEN how to hogtie a person.

221.  Defendant DEKRYGER told the other defendants to make a  loop  with  a  rope  and  put  it  around  MR.  WALBY's  feet  at approximately 2:38:40.

222.  Defendant HILL began the process of tying the decedent's feet but Defendant KNOOP volunteered to finish the loop and took over.

223.  During  the  hogtying  process,  as  Defendant  KNOOP prepared the rope,

a. Defendant HILL continued to press the decedent's left thigh with his left boot,

b. Defendant POYHONEN continued to press his right boot into Mr. Walby's left lower back,

c. Defendant KINNUNEN briefed Defendant POYHONEN on what had happened before he arrived and told him that Mr. Walby had cuts all over his body,

d. Defendant DEKRYGER pressed the decedent's cuffed arms into his back pushing his chest and abdomen toward the ground as Mr. Walby muttered, "you didn't kill me yet," and

e. Defendant WUEBBEN stood by watching the entirety of the events.

224.   Defendants GRENTZ and JURMU walked away but Defendant JURMU returned to observe the tie-up.

225.   Defendant KNOOP raised Mr. Walby's entwined feet from the ground to tie them to the decedent's wrists.

226.   One of his feet slipped out of the noose at approximately 2:39:12 and fell back to the ground.

227.   Though there was no danger to any officer posed by the subdued, unarmed, handcuffed, and nearly naked Walby, who was being held down by four officers, and monitored by at least two others, Defendant KINNUNEN re-engaged.

47

228.  Defendant KINNUNEN, without warning, drive-stunned Mr. Walby at approximately 2:39:13 and tased him for five more seconds while he was handcuffed and lying on his stomach.

229.  Defendant DEKRYGER exclaimed, "stop resisting," when there was no resistance and as the taser was being deployed.

230.  Defendant KNOOP, and the other six officers who were at his side, then lifted Mr. Walby's tied feet again and pressed them toward the decedent's buttocks to tie his feet to his ankles.

231.  Mr. Walby wiggled and said, "you can't hogtie me."

232.  Defendant KINNUNEN again responded with his taser by drive-stunning the decedent and pressing the center of his back toward the ground, tasing him again for an additional five seconds at approximately 2:39:40.

233.  Defendants KNOOP and POYHONEN then tightened the rope that was wrapped around Mr. Walby's ankles and drew the decedent's feet all the way to his buttocks where his ankles were tied to his wrists.

234.  The defendants had Mr. Walby hogtied in the prone position by approximately 2:39:52.

48

235. Defendant POYHONEN thereafter stood below the decedent's tied legs and pressed them into the decedent's buttocks.

236. As Defendant KINNUNEN told Defendant POYHONEN that both he and Defendant JURMU had tased the decedent, Mr. Walby, who was already muttering and professing that it was the end of the world, responded to the defendants' conversation by saying, "I need more taser."

237. Ben was doing nothing but muttering and lying on his stomach while he was hogtied and being pressed toward the ground.

238. Nevertheless, Defendant KINNUNEN tased him between his shoulder blades in drive stun mode for five seconds beginning at approximately 2:41:25.

239. In the matter of 5 ½ minutes, Defendants WUEBBEN, KINNUNEN, and JURMU pulled their taser triggers a total of at least 17 times and electricity penetrated Mr. Walby's skin and fat for at least 54 seconds.

240. The abuse to BENJAMIN WALBY did not conclude with the end of his tasings.

241. The defendants forced BENJAMIN WALBY, who had already been lying on his stomach for 4 ¾ minutes before being

49

hogtied, to lie in the same position with near constant significant or substantial pressure being applied to his backside for an additional 13 minutes and 20 seconds, as they forcefully pressed him to the ground, before deciding to take him to the hospital. (Defendants did not allow the ambulance already on scene to render aid to Mr. Walby).

242. In sum total, BENJAMIN WALBY was pressed to the ground on his stomach for approximately 18 minutes and 5 seconds before he was picked up and slid into a police car where he would lay on his stomach for an additional several minutes.

243. The following events occurred during the nearly ¼ of an hour that Mr. Walby lay hogtied on the ground nearly naked in the freezing cold.

244. Defendant KNOOP stood at the decedent's side and continued pressing his boot into the decedent's back.

245. Defendant HILL stood at the decedent's other side and continued pressing his boot into the decedent's buttocks.

246. Defendant KINNUNEN remained at the top of the decedent's body and continued forcefully pressing his TASER into the decedent's back.

247.   Defendant POYHONEN pressed the decedent's legs toward the decedent's cuffed hands with both his own hands and his boot after originally drawing the rope tight.

248.   Defendant KINNUNEN continued to forcefully press his TASER into Mr. Walby's back.

249.   Having stepped away for a couple of minutes, Defendant DEKRYGER returned to the side of the hogtied decedent at approximately 2:42:24 and zip-tied the decedent's ankles before pressing his boot into Mr. Walby's back.

250.   BENJAMIN WALBY's speech weakened and his breathing labored.

251.   Defendants HALEY BIANUCCI and JENNIFER HASTREITER arrived at the scene at approximately 2:44:52.

252.   Their first view was of Mr. Walby lying on his stomach, hogtied with Defendant KNOOP pressing his right boot into the decedent's right lower back and holding Ben's legs in the air with the end of the rope hogtie that he had taken from Defendant POYHONEN.

253.   Defendants BIANUCCI and HASTREITER also observed Defendant KINNUNEN pressing his right boot into the decedent's right shoulder, and Defendant HILL standing over Ben, watching the

51

excessive force before reapplying his left boot to the decedent's back at approximately 2:45:43.

254. Defendants HALEY BIANUCCI and JENNIFER HASTREITER, along with the other defendants, could hear agonal moaning and labored breathing.

255. Defendant DEKRYGER pushed Mr. Walby's feet toward his ankles at approximately 2:47:00.

256. Defendant POYHONEN returned to the decedent with leg shackles and a strap that he had retrieved from Defendant WUEBBEN's police car, with Defendant WUEBBEN's consent, at approximately 2:47:57.

257. Defendant BLAKE FRANTII arrived at approximately 2:48:41, bent down and looked over Mr. Walby, who remained hogtied on his stomach with Defendants HILL, KINNUNEN, and KNOOP continuing to step on his backside, pushing it toward the ground.

258. Defendant HALEY BIANUCCI then placed the leg shackles given to her by Defendant POYHONEN upon Mr. Walby's ankles at approximately 2:48:51, which were an addition to the rope that was

already being used by Defendant KNOOP to hold him in the hogtied position.

259.   Defendant KNOOP continued to hold the rope that secured the hogtied position while he and Defendant KINNUNEN continued to stand on Mr. Walby's back after Defendant BIANUCCI locked the shackles.

260.   Defendant HILL intermittently repositioned himself by taking his boot off of Ben, only to step back on the decedent moments later.

261.   About a minute later, Defendant HILL, still applying pressure to the decedent's back, reiterated an earlier stated need to look Mr. Walby over to determine if he had any life-threatening injuries.

262.   The defendants briefly rolled the lifeless and unresponsive body of Benjamin Walby onto his side at approximately 2:50:01.

263.   Defendant KINNUNEN re-announced to all defendants that Mr. Walby had obvious cuts about his body.

264.   Defendant HILL suggested they call an ambulance and the rope that tightly connected the decedent's ankles to his wrists was

cut at approximately 2:52:01, resulting in Mr. Walby non-volitionally flopping back onto his belly.

265. Defendants decided that instead of waiting for an ambulance they would take the decedent to the hospital in the back of a scout car.

266. The defendants pulled the decedent into the backseat of Defendant WUEBBEN's scout car at approximately 2:53:12, where he lay in the prone position as Defendant FRANTTI set off to drive him to the hospital at approximately 2:55 a.m., after he had already been forcefully pushed to the ground in the prone position for nearly twenty minutes.

267. Once at the hospital, the decedent, who was still handcuffed behind the back, lying on his stomach, was pulled out of the police car by Defendants FRANTTI, GRENTZ, KINNUNEN and/or POYHONEN at approximately 2:58 a.m.

268. The defendants then dragged the decedent onto a stretcher and laid him on his stomach before wheeling him into the hospital where emergency department staff found him to be "majorly unresponsive."

269. BENJAMIN WALBY had suffered a cardiac arrest.

270.  Mr. Walby had no pulse and was not breathing when he was brought into the hospital.

271.  A pulse was recovered after lengthy violent and mechanical chest compressions; however, BENJAMIN WALBY died several days later, on April 4, 2024, due to a lack of oxygen to the brain ("global hypoxic ischemic encephalopathy").

272.  The direct actions of the officers, including the officers' use of unreasonable force by causing asphyxiating pressure to be applied to his body and tasing him, their failure to intervene or properly supervise, and their failure to seek readily available medical attention for the decedent, who was suffering serious medical conditions, caused BENJAMIN WALBY to stop breathing, go into cardiac arrest, suffer hypoxic ischemic encephalopathy, and ultimately die.

### F. **CLAIMS**

### **COUNT I – FAILURE TO DEESCALATE BY DEFENDANTS SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN and DYLAN GRENTZ**

273.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

274.  Plaintiff's Decedent, BENJAMIN WALBY, had a clearly established constitutional right on March 23, 2024, to be free from detention and from the application of excessive force as guaranteed by the Fourth Amendment to the United States Constitution when his apartment was approached by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ.

275.  The general rule is that a police officer's use of force must be objectively reasonable in light of the facts and circumstances that were known to the officer before the force was applied and that the degree of force must be reduced as the need diminishes.

276.  However, it is clearly established that a police officer who encounters a person with mental illness, must determine whether and how to deescalate the situation before resorting to force.

277.  A reasonable police officer who encountered BENJAMIN WALBY on March 23, 2024, would have understood that the decedent was suffering from mental illness and the most reasonable approach would be deescalation for reasons that include but are not necessarily limited to:

      a. Police were called out to a noise complaint, not a crime,

56

b. Police did not suspect that BENJAMIN WALBY was armed,

c. The decedent was yelling incoherently from behind a closed door,

d. The decedent expressed suicidal thoughts from behind a closed door,

e. The decedent expressed delusional thoughts from behind a closed door,

f. The decedent sounded manic, impulsive, paranoid, and agitated from behind a closed door,

g. Defendant WUEBBEN described the decedent as being "nuts,"

h. Defendant WUEBBEN was told that the decedent was suffering an existential crisis,

i. The decedent banged into his door,

j. When the decedent was seen, he was virtually naked and bleeding from cuts about his body, and

k. Any other reasons that become known throughout discovery.

278.   Because a reasonable police officer would have known that they were encountering a person suffering from mental illness, Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ, owed BENJAMIN WALBY a constitutionally duty to deescalate by retreating and monitoring the situation by doing the following:

a. Designating an officer to be in charge and to be the sole communicator,

b. Explaining that they were there to help,

c. Backing off and passively monitoring,

d. Requesting the assistance of medical and mental health professionals,

e. Employing conflict resolution and deescalation techniques,

f. Understanding that Mr. Walby might not comprehend commands and would feel threatened by authority,

g. Refraining from using stances or tactics that could be interpreted as aggressive,

h. Preventing other officers on scene from engaging,

i. Refraining from speaking with a loud voice or using threats to obtain compliance,

j. Follow accepted police practices and procedures, and

k. Any other actions that become known throughout discovery.

279. Rather than deescalating and monitoring, Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ escalated by using unreasonable and excessive force in violation of BENJAMIN WALBY's clearly established rights.

280. Defendant SCOTT WUEBBEN escalated the situation and used excessive force against the decedent by doing the following:

a. Failing to take charge of the situation as the initial responder,

b. Allowing other officers to attempt to engage in dialogue with the decedent after attempting to initiate dialogue himself,

c. Failing to explain that he was there to help,

d. Failing to back-off and passively monitor and instead escalating by aiming his taser at the decedent and allowing Defendant JURMU to draw his handgun in a show of authority,

e. Failing to request the presence of a person trained in crisis management,

f. Failing to seek specialized resources, including but not limited to medical professionals and mental health professionals,

g. Failing to employ conflict resolution and deescalation techniques,

h. Failing to recognize that the decedent might not understand commands,

i. Taking an aggressive stance and using aggressive tactics,

j. Making or allowing threats to be made to achieve compliance,

k. Failing to advise other responders that the subject was mentally ill and to approach without lights and sirens,

l. Engaging in acts of force and excessive force,

m. Any other actions that become known throughout discovery.

281. Defendant ALAN JURMU escalated the situation and used excessive force against the decedent by doing the following:

a. To the extent that he was trained in crisis intervention, failing to take charge of the situation or designating an officer trained in crisis management to take charge,

b. Attempting to engage in dialogue with the decedent after Defendant WUEBBEN began the dialogue,

c. Allowing other defendants to participate in dialogue with the decedent,

d. Failing to explain that he was there to help,

e. Failing to back-off and passively monitor and instead escalating by drawing his handgun and shining a bright light at the decedent, in a show of authority,

f. Failing to request the presence of a person trained in crisis management,

g. Failing to seek specialized resources, including but not limited to medical professionals and mental health professionals,

h. Failing to employ conflict resolution and deescalation techniques,

i. Failing to recognize that the decedent might not understand commands,

j. Taking an aggressive stance and using aggressive tactics,

k. Making or allowing threats to be made to achieve compliance,

l. Engaging in acts of force and excessive force,

m. Failing to advise other responders that the subject was mentally ill and to approach without lights and sirens, and

n. Any other actions that become known throughout discovery.

282. Defendant NATHAN KINNUNEN escalated the situation and used excessive force against the decedent by doing the following:

a. To the extent that he was trained in crisis intervention, failing to take charge of the situation or designating an officer trained in crisis management to take charge,

b. Attempting to engage in dialogue with the decedent after Defendant WUEBBEN began the dialogue,

c. Allowing other defendants to participate in dialogue with the decedent,

d. Failing to explain that he was there to help,

e. Failing to back-off and passively monitor and instead escalating by pointing his taser at the decedent, in a show of authority,

f. Failing to request the presence of a person trained in crisis management,

g. Failing to seek specialized resources, including but not limited to medical professionals and mental health professionals,

h. Failing to employ conflict resolution and deescalation techniques,

i. Failing to recognize that the decedent might not understand commands,

j. Taking an aggressive stance and using aggressive tactics,

k. Making or allowing threats to be made to achieve compliance,

61

l.  Engaging in acts of force and excessive force,

m. Failing to advise other responders that the subject was mentally ill and to approach without lights and sirens, and

n.  Any other actions that become known throughout discovery.

283. Defendant DYLAN GRENTZ escalated the situation and used excessive force against the decedent by doing the following:

a.  To the extent that he was trained in crisis intervention, failing to take charge of the situation or designating an officer trained in crisis management to take charge,

b.  Attempting to engage in dialogue with the decedent after Defendant WUEBBEN began the dialogue,

c.  Allowing other defendants to participate in dialogue with the decedent,

d.  Failing to explain that he was there to help,

e.  Failing to back-off and passively monitor and instead escalating by pointing his taser at the decedent, in a show of authority,

f.  Failing to request the presence of a person trained in crisis management,

g.  Failing to seek specialized resources, including but not limited to medical professionals and mental health professionals,

h.  Failing to employ conflict resolution and deescalation techniques,

i.  Failing to recognize that the decedent might not understand commands,

    j. Taking an aggressive stance and using aggressive tactics,

    k. Making or allowing threats to be made to achieve compliance,

    l. Engaging in acts of force and excessive force,

    m. Failing to advise other responders that the subject was mentally ill and to approach without lights and sirens, and

    n. Any other actions that become known throughout discovery.

284. The failure of Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ to deescalate was objectively unreasonable.

285. The actions of Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ resulted in the decedent fleeing his apartment.

286. Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ, were obligated to deescalate and if they elected to pursue, their obligation was to pursue without force.

287. Rather than employing deescalation techniques toward an individual who all officers knew was unarmed, including retreating and passively monitoring him, Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ engaged in a foot pursuit that resulted in

63

Defendants WUEBBEN and KINUNNEN applying excessive force to BENJAMIN WALBY by simultaneously tasing him without advising him that he was under arrest or that he would be tased if he did not stop.

288.  The failure to deescalate resulted in BENJAMIN WALBY being tackled, excessively tased, hogtied, and held under asphyxiating conditions causing his death as stated in the factual section of this complaint and below.

289.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ' unconstitutional actions.

290. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ that include but are not necessarily limited to:

> a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,
>
> b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

    c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

    d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

    e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

291. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT II – EXCESSIVE FORCE AGAINST SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, AND DYLAN GRENTZ FOLLOWING THE FAILURE TO DEESCALATE AND DURING THE CONTINUED FORCE APPLICATION

292.   Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

293.   Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ owed a continuing constitutional duty to deescalate when they elected to pursue BENJAMIN WALBY, who a reasonable officer would have known was mentally ill.

294.   Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ owed a constitutional duty to BENJAMIN WALBY to limit the level of force that they would apply to what was reasonable and proportional based upon what a reasonable officer would have known before force was applied, limiting their force to the least amount necessary to achieve lawful objectives and decreasing the level of force as the need diminished.

295.   A reasonable officer would have known:

   a. BENJAMIN WALBY was mentally ill,

   b. BENJAMIN WALBY was unarmed,

66

c. BENJAMIN WALBY was not suspected of a violent crime,

d. BENJAMIN WALBY was not under the influence of drugs or alcohol,

e. BENJAMIN WALBY had made no threats to officers,

f. BENJAMIN WALBY was delusional and incapable of following commands,

g. BENJAMIN WALBY was not told that he was under arrest, and

h. BENJAMIN WALBY did not pose a danger in the presence of four police officers.

296. Despite their constitutional duties and the information that was available to a reasonable officer, Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ violated BENJAMIN WALBY's clearly established right to be free from excessive force when they used unreasonable and excessive force upon him as stated in the factual portion of this complaint.

297. Defendant SCOTT WUEBBEN used excessive force by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Failing to warn BENJAMIN WALBY before deploying his taser,

c. Tasing BENJAMIN WALBY for flight alone as he ran down the stairs from his apartment,

d. Tasing BENJAMIN WALBY simultaneously with other officers when he knew that other officers were deploying their tasers,

e. Deploying his taser upon BENJAMIN WALBY when BENJAMIN WALBY did not pose a danger to himself or others,

f. Tasing BENJAMIN WALBY after he was tackled to the ground for compliance in lieu of other methods,

g. Tasing BENJAMIN WALBY when he was subdued,

h. Causing BENJAMIN WALBY to be tased more than three consecutive times,

i. Causing BENJAMIN WALBY to be tased for a cumulative time of more than 15 seconds,

j. Assisting in pressing BENJAMIN WALBY to the ground while he was in the prone position, and

k. Any other actions that become known throughout the course of litigation.

298. Defendant ALAN JURMU used excessive force by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Failing to warn BENJAMIN WALBY before deploying his taser,

c. Tasing BENJAMIN WALBY for flight alone as he ran down the stairs from his apartment,

d. Tasing BENJAMIN WALBY simultaneously with other officers when he knew that other officers were deploying their tasers,

e. Deploying his taser upon BENJAMIN WALBY when BENJAMIN WALBY did not pose a danger to himself or others,

f. Tasing BENJAMIN WALBY after he was tackled to the ground for compliance in lieu of other methods,

g. Tasing BENJAMIN WALBY when he was subdued,

h. Causing BENJAMIN WALBY to be tased more than three consecutive times,

i. Causing BENJAMIN WALBY to be tased for a cumulative time of more than 15 seconds,

j. Assisting in pressing BENJAMIN WALBY to the ground while he was in the prone position, and

k. Any other actions that become known throughout the course of litigation.

299. Defendant NATHAN KINNUNEN used excessive force by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Failing to warn BENJAMIN WALBY before deploying his taser,

c. Tasing BENJAMIN WALBY for flight alone as he ran down the stairs from his apartment,

d. Tasing BENJAMIN WALBY simultaneously with other officers when he knew that other officers were deploying their tasers,

e. Deploying his taser upon BENJAMIN WALBY when BENJAMIN WALBY did not pose a danger to himself or others,

f. Tasing BENJAMIN WALBY after he was tackled to the ground for compliance in lieu of other methods,

g. Tasing BENJAMIN WALBY when he was subdued,

h. Causing BENJAMIN WALBY to be tased more than three consecutive times,

i. Causing BENJAMIN WALBY to be tased for a cumulative time of more than 15 seconds,

j. Assisting in pressing BENJAMIN WALBY to the ground while he was in the prone position, and

k. Any other actions that become known throughout the course of litigation.

300.  Defendant DYLAN GRENTZ used excessive force by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Tackling BENJAMIN WALBY and holding him to the ground,

c. Assisting in pressing BENJAMIN WALBY to the ground while he was in the prone position, and

d. Any other actions that become known throughout the course of litigation.

301.  The failure to deescalate and instead use force resulted in BENJAMIN WALBY being tackled, excessively tased, hogtied, and held under asphyxiating conditions causing his death as stated in the factual section of this complaint and below.

302.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately

died as a direct and proximate result of Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ' unconstitutional actions.

303. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants WUEBBEN, JURMU, KINNUNEN, and GRENTZ that include but are not necessarily limited to:

     a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

     b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

     c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

     d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

     e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

304. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's

constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

### COUNT III – EXCESSIVE FORCE BEFORE HOGTYING BY DEFENDANTS SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL AND BROCK POYHONEN

305.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

306.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, and DYLAN GRENTZ were aware that BENJAMIN WALBY was mentally ill and at all times owed a continuing constitutional duty to deescalate.

307.  Any reasonable officer would have known that BENJAMIN WALBY was mentally ill based upon what Defendants PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN would have observed and been told when they arrived on the scene of the incident; therefore, Defendants PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL and BROCK POYHONEN likewise owed a duty to deescalate when they arrived on scene.

308.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN owed a constitutional duty to BENJAMIN WALBY to limit the level of force that they would apply to what was reasonable and proportional based upon what a reasonable officer would have known before force was applied, limiting their force to the least amount of force necessary to achieve lawful objectives and decreasing the level of force as the need diminished.

309.  A reasonable officer would have known:

        a. BENJAMIN WALBY was unarmed,

b. BENJAMIN WALBY was not suspected of a violent crime,

c. BENJAMIN WALBY was not under the influence of drugs or alcohol,

d. BENJAMIN WALBY had made no threats to officers,

e. BENJAMIN WALBY was delusional and incapable to follow commands,

f. BENJAMIN WALBY was not told that he was under arrest, and

g. BENJAMIN WALBY did not pose a danger to himself or others in the presence of six to eight police officers.

310.   Despite their constitutional duties and the information that was available to a reasonable officer, Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN used unreasonable and excessive force upon BENJAMIN WALBY, in violation of his clearly established rights, as stated in the factual portion of this complaint.

311.   Defendant WUEBBEN continued to use excessive force by

a. Failing to deescalate and monitor the situation before engaging in force,

b. Forcefully applying pressure upon BENJAMIN WALBY and participating in the continued detention of the decedent,

74

c. Applying significant and substantial pressure to BENJAMIN WALBY causing asphyxiating conditions, and,

d. Any other actions that become known throughout litigation.

312.  Defendant JURMU continued to use excessive force upon

BENJAMIN WALBY by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Failing to warn BENJAMIN WALBY before deploying his taser,

c. Tasing BENJAMIN WALBY while he was subdued, incapacitated or handcuffed,

d. Tasing BENJAMIN WALBY simultaneously with other officers when he knew that other officers were deploying their tasers,

e. Deploying his taser upon BENJAMIN WALBY when BENJAMIN WALBY did not pose a danger of harm to himself or others,

f. Tasing BENJAMIN WALBY after he was tackled to the ground for compliance in lieu of other methods,

g. Tasing BENJAMIN WALBY when he was subdued,

h. Causing BENJAMIN WALBY to be tased more than three consecutive times,

i. Causing BENJAMIN WALBY to be tased for a cumulative time of more than 15 seconds,

j. Assisting in pressing BENJAMIN WALBY to the ground while he was in the prone position,

    k. Applying significant and substantial pressure to BENJAMIN WALBY causing asphyxiating conditions, and

    l. Any other actions that become known throughout the course of litigation.

313. Defendant NATHAN KINNUNEN used excessive force by:

    a. Failing to deescalate and monitor the situation before engaging in force,

    b. Failing to warn BENJAMIN WALBY before deploying his taser,

    c. Tasing BENJAMIN WALBY while he was subdued, incapacitated or handcuffed,

    d. Tasing BENJAMIN WALBY simultaneously with other officers when he knew that other officers were deploying their tasers,

    e. Deploying his taser upon BENJAMIN WALBY when BENJAMIN WALBY did not pose a danger to himself or others,

    f. Tasing BENJAMIN WALBY after he was tackled to the ground for compliance in lieu of other methods,

    g. Tasing BENJAMIN WALBY when he was subdued,

    h. Causing BENJAMIN WALBY to be tased more than three consecutive times,

    i. Causing BENJAMIN WALBY to be tased for a cumulative time of more than 15 seconds,

    j. Assisting in pressing BENJAMIN WALBY to the ground while he was in the prone position,

76

k. Applying significant and substantial pressure to BENJAMIN WALBY causing asphyxiating conditions, and

l. Any other actions that become known throughout the course of litigation.

314. Defendant DYLAN GRENTZ used excessive force by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Forcefully applying pressure upon BENJAMIN WALBY and participating in the continued detention of the decedent,

c. Applying significant and substantial pressure to BENJAMIN WALBY causing asphyxiating conditions, and,

d. Any other actions that become known throughout litigation.

315. Defendants PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN used excessive force by:

a. Failing to deescalate and monitor the situation before engaging in force,

b. Forcefully applying pressure upon BENJAMIN WALBY and participating in the continued detention of the decedent,

c. Applying significant and substantial pressure to BENJAMIN WALBY causing asphyxiating conditions, and,

d. Any other actions that become known throughout litigation.

316.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants WUEBBEN, JURMU, KINNUNEN, GRENTZ, DEKRYGER, KNOOP, HILL, and POYHONEN'S unconstitutional actions.

317. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN that include but are not necessarily limited to:

     a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

     b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

     c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

     d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

     e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-

law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

318.  Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT IV – EXCESSIVE RESTRAINT -- HOGTYING BY DEFENDANTS SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, AND BROCK POYHONEN

319.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

320.   Any reasonable officer would have known that BENJAMIN WALBY was mentally ill; therefore, Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN at all times owed a continuing constitutional duty to deescalate.

321.   Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN owed a constitutional duty to BENJAMIN WALBY to limit the level of force that they would apply to what was reasonable and proportional based upon what a reasonable officer would have known before force was applied, limiting their force to the least amount necessary to achieve lawful objectives and decreasing the level of force as the need diminished.

322.   Any reasonable officer would have known that restraining an individual such as BENJAMIN WALBY, who was mentally ill, was not suspected of a crime, was unarmed, and was surrounded by eight police officers, by hogtying him was excessive and likely to limit his ability to breathe.

323. It was a violation of Michigan State Police policy to hogtie an individual.

324. Nevertheless, in violation of policy, Defendants PETER DEKRYGER and BRADEN KNOOP, instructed the other defendants how to hogtie BENJAMIN WALBY.

325. Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN all participated in the process of unreasonably restraining the decedent, either actively or by acquiescence.

326. The actions of Defendants violated BENJAMIN WALBY's clearly established right to be free from excessive force.

327. BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants WUEBBEN, JURMU, KINNUNEN, GRENTZ, DEKRYGER, KNOOP, HILL and POYHONEN'S unconstitutional actions.

328. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ,

81

PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL and

BROCK POYHONEN that include but are not necessarily limited to:

  a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

  b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

  c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

  d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

  e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

329.  Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and

against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT V – EXCESSIVE FORCE – CAUSING ASPHYXIATING CONDITIONS BY DEFENDANTS SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, AND BROCK POYHONEN

330.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

331.  Plaintiff's Decedent, BENJAMIN WALBY, had a clearly established constitutional right that prevented the defendants from applying substantial or significant pressure upon him while he lay on the ground, handcuffed in the prone position, before and while he was subdued and being hogtied.

332.  Plaintiff's Decedent, BENJAMIN WALBY, had a clearly established constitutional right to free from the continued application of excessive force while he was handcuffed and lying on the ground in the prone position, hogtied.

83

333.    Plaintiff's Decedent, BENJAMIM WALBY, had a clearly established constitutional right to be free from pressure causing asphyxiating conditions while subdued, hogtied, and laying in the prone position.

334.    No reasonable police officer would apply substantial or significant pressure upon a detainee while he or she was in the prone position handcuffed behind the back.

335.    No reasonable police officer would force a handcuffed detainee to remain in the prone position.

336.    No reasonable police officer would hogtie a detainee.

337.    No reasonable police officer would apply substantial or significant pressure causing asphyxiating conditions upon a hogtied detainee.

338.    No reasonable police officer would apply significant or substantial pressure with a taser upon a detainee's back and tase an individual who was subdued, handcuffed, and hogtied laying on the ground in the prone position.

339.    Before during and after the hogtying of the decedent, excessive force was used in manners, that include but are not necessarily limited to the following:

a. Defendant GRENTZ tackled and participated in the handcuffing and hogtying of the decedent applying substantial or significant pressure causing asphyxiating conditions,

b. Defendant WUEBBEN participated in the handcuffing and hogtying of the decedent applying substantial or significant pressure causing asphyxiating conditions,

c. Defendant JURMU, participated in the handcuffing and hogtying of the decedent applying substantial or significant pressure causing asphyxiating conditions,

d. Defendant KINNUNEN participated in the handcuffing and hogtying of the decedent applying substantial or significant pressure causing asphyxiating conditions,

e. Defendant DEKRYGER participated in the handcuffing and hogtying of the decedent applying substantial or significant pressure causing asphyxiating conditions,

f. Defendant KNOOP participated in the handcuffing and hogtying of the decedent applying substantial or significant pressure causing asphyxiating conditions,

g. Defendant DEKRYGER applied substantial or significant pressure causing asphyxiating conditions by pressing the decedent's cuffed hands into his lower back as he lay in the prone position,

h. Defendant POYHONEN applied substantial or significant pressure causing asphyxiating conditions by standing on the decedent's back,

i. Defendant HILL applied substantial or significant pressure causing asphyxiating conditions by

85

pressing the decedent's buttocks toward the ground with his boot as he lay in the prone position,

j. Defendant KINNUNEN applied substantial or significant pressure causing asphyxiating conditions by pressing his TASER into the decedent's upper back as he lay in the prone position,

k. Defendant KINNUNEN repeatedly and continuously deployed his TASER in drive-stun mode into the decedent for a prolonged period of time without warning and without time to respond while applying significant or substantial pressure into Mr. Walby's back as he lay in the prone position,

l. Defendants KNOOP and POYHONEN, drew the rope that was used to hogtie the decedent tightly, connecting the decedents wrists to his ankles,

m. Defendant POYHONEN applied substantial or significant pressure causing asphyxiating conditions by pressing the decedent's ankles into his wrists for a prolonged period of time as he lay in the prone position after he was hogtied,

n. Defendant KNOOP applied substantial or significant pressure causing asphyxiating conditions by pressing his boot into the decedent's back for a prolonged period of time as he lay in the prone position after he was hogtied,

o. Defendant HILL applied substantial or significant pressure causing asphyxiating conditions by pressing his boot into the decedent's buttocks for a prolonged period of time as he lay in the prone position after he was hogtied,

p. Defendant KINNUNEN applied substantial or significant pressure causing asphyxiating conditions by pressing his boot into the decedent's back for a

prolonged period of time as he lay in the prone position after he was hogtied,

q. Defendant DEKRYGER reinforced the hogtying with zip ties and pressed his boot with substantial or significant pressure into the decedent's back for a prolonged period of time causing asphyxiating conditions, while the decedent was hogtied in the prone position with other officers holding him to the ground.

340. The decedent, BENJAMIN WALBY, suffered from excessive force and a deprivation of his clearly established constitutional rights that directly and proximately caused him to be exposed to asphyxiating conditions that caused his death, as well as physical and emotional injury before his demise.

341. BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants WUEBBEN, JURMU, KINNUNEN, GRENTZ, DEKRYGER, KNOOP, HILL and POYHONEN's unconstitutional actions.

342. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ,

PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL and

BROCK POYHONEN that include but are not necessarily limited to:

a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

343. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and

against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, and BROCK POYHONEN in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT VI – EXCESSIVE FORCE -- TASINGS BY DEFENDANTS SCOTT WUEBBEN, ALAN JURMU AND NATHAN KINNUNEN

344.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

345. Defendants SCOTT WUEBBEN, ALAN JURMU, and NATHAN KINNUNEN each owed a constitutional duty to BENJAMIN WALBY to limit the level of force that they would apply to what was reasonable and proportional based upon what a reasonable officer would have known before force was applied, limiting their force to the least amount necessary to achieve lawful objectives and decreasing the level of force as the need diminished.

346.  BENJAMIN WALBY had a constitutional right not to be unreasonably tased under the circumstances because he was unarmed, he was not suspected of a crime, and he did not present a

risk of danger to the officers or others in the presence of numerous police officers.

347.   In that regard, the following was clearly established on March 23, 2024:

a. That a taser may only be used under circumstances that present a risk of danger to the officers or others that could be mitigated by the use of a taser,

b. The gratuitous or excessive use of a taser violates the right to be free from excessive force,

c. An officer may not use a taser after a person is handcuffed, subdued, incapacitated, or hogtied,

d. An officer may not use a taser for flight alone,

e. An officer may not use a taser for pain compliance,

f. A warning and opportunity to comply must be given before each taser usage,

g. Tasers may not be used simultaneously,

h. Tasers must be used in accordance with the manufacturer's warnings and proper police policy and procedures,

i. Tasers may not be used for a prolonged period of time, and

j. Any other rights that become known throughout the course of litigation.

348.   A reasonable officer would have known that BENJAMIN WALBY was mentally ill and would not be able to understand or respond to commands.

349.   A reasonable officer would have understood that a person suffering from mental illness would not understand commands and use methods of control other than taser a taser under the circumstances in this case.

350.  In this matter Defendants SCOTT WUEBBEN, ALAN JURMU, and NATHAN KINNUNEN, used excessive force in violation of BENJAMIN WALBY's clearly established rights when they tased.

351.   Defendant WUEBBEN used excessive force in the following manners:

> a. Tasing BENJAMIN WALBY without warning and simultaneously with another taser at approximately 2:35:46 for flight and/or pain control alone and when no person was in danger,
>
> b. Tasing BENJAMIN WALBY at approximately 2:35:57 without warning and after tasers had been deployed three times, for pain control while the decedent was being held to the ground surrounded by other officers and other control techniques would have been more appropriate and effective, and
>
> c. Violating accepted policies and procedures for taser usage.

352.  Defendant JURMU used excessive force when he tased BENJAMIN WALBY at approximately 2:36:41 because:

       a. No warning or time for compliance was provided,

       b. The decedent was held to the ground surrounded by numerous other officers such that he did not present a danger to the officers,

       c. Other control techniques were more reasonable,

       d. The decedent was being simultaneously tased by another officer,

       e. The decedent had been tased too many times for too long,

       f. He violated accepted policies and procedures for taser usage, and

       g. Any additional reasons that become known throughout litigation or that are stated in this complaint.

353.  Defendant JURMU used excessive force when he tased BENJAMIN WALBY at approximately 2:38:23 for the reasons stated above and because the decedent was handcuffed and held to the ground by numerous other officers when the taser was deployed.

354.  Defendant KINNUNEN used excessive force when he tased BENJAMIN WALBY at approximately 2:35:46 because:

       a. No warning or time for compliance was provided,

       b. The tasing was for flight alone,

  c. His taser was deployed simultaneously with that of another officer,

  d. No person was in danger of harm, and

  e. Any additional reasons that become known throughout litigation or that are stated in this complaint.

355.  Defendant KINNUNEN used excessive force when he tased

BENJAMIN WALBY at approximately 2:35:48 and 2:35:49 because:

  a. No warning or time for compliance was provided,

  b. The decedent was subdued on the ground and there was no immediate danger with numerous officers surrounding him,

  c. Other control techniques were more reasonable,

  d. He did not give time for compliance between firing his taser,

  e. The decedent had been tased too many times for too long,

  f. He violated accepted policies and procedures for taser usage, and

  g. Any additional reasons that become known throughout litigation or that are stated in this complaint.

356.  Defendant KINNUNEN used excessive force when he tased

BENJAMIN WALBY at approximately 2:36:20 because:

  a. No warning or time for compliance was provided,

b. The decedent was subdued on the ground and there was no immediate danger with numerous officers surrounding him,

c. Other control techniques were more reasonable,

d. The decedent had been tased too many times for too long,

e. He violated accepted policies and procedures for taser usage, and

f. Any additional reasons that become known throughout litigation or that are stated in this complaint.

357. Defendant KINNUNEN used excessive force when he tased BENJAMIN WALBY at approximately 2:36:20 because:

a. The tasing was gratuitous and administered as a result of body reaction that was caused by prior tasings and/or positioning,

b. No warning or time for compliance was provided,

c. The decedent was subdued on the ground and there was no immediate danger with numerous officers surrounding him,

d. Other control techniques were more reasonable,

e. The decedent had been tased too many times for too long,

f. The tasing was for body movement alone,

g. He violated accepted policies and procedures for taser usage, and

      h. Any additional reasons that become known throughout litigation or that are stated in this complaint.

358.   Defendant KINNUNEN used excessive force when he tased

BENJAMIN WALBY at approximately 2:36:41 and 2:36:45 because:

      a. The tasing was gratuitous and administered as a result of body reaction that was caused by prior tasings and/or positioning,

      b. No warning or time for compliance was provided,

      c. The decedent was subdued on the ground and there was no immediate danger with numerous officers surrounding him,

      d. Other control techniques were more reasonable,

      e. The decedent had been tased too many times for too long,

      f. Another officer was simultaneously tasing the decedent,

      g. The tasing was for body movement alone,

      h. He violated accepted policies and procedures for taser usage, and

      i. Any additional reasons that become known throughout litigation or that are stated in this complaint.

359. Defendant KINNUNEN's subsequent tasings were

excessive because they occurred after the decedent was handcuffed

and / or hogtied and because:

     a. The tasings were gratuitous and administered as a result of body reaction that was caused by prior tasings and/or positioning,

     b. No warning or time for compliance was provided,

     c. The decedent was subdued on the ground and there was no danger with numerous officers surrounding him,

     d. Other control techniques were more reasonable,

     e. The decedent had been tased too many times for too long,

     f. He violated accepted policies and procedures for taser usage, and

     g. Any additional reasons that become known throughout litigation or that are stated in this complaint.

360. The decedent, BENJAMIN WALBY, suffered from excessive force and a deprivation of his clearly established constitutional rights that directly and proximately caused him to be exposed to asphyxiating conditions and unreasonable and excessive tasings that caused his death, as well as physical and emotional injury before his demise.

361. BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants WUEBBEN, JURMU, and KINNUNEN's unconstitutional actions.

96

362. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants WUEBBEN, JURMU, and KINNUNEN that include but are not necessarily limited to:

   a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

   b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

   c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

   d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

   e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

363. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants WUEBBEN, JURMU, and KINNUNEN in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT VII – INDIVIDUAL LIABILITY AGAINST DEFENDANTS HALEY BIANUCCI AND BLAKE FRANTTI FOR EXCESSIVE FORCE BY APPLYING SUBSTANTIAL OR SIGNIFICANT PRESSURE CAUSING ASPHYXIATING CONDITIONS

364. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

365. Plaintiff's Decedent, BENJAMIN WALBY, had a constitutional right to free from the continued application of excessive force while he was hogtied.

366. Plaintiff's Decedent, BENJAMIM WALBY, had a clearly established constitutional right to be free from pressure causing asphyxiating conditions while subdued and handcuffed.

367.  No reasonable police officer would apply substantial or significant pressure upon a detainee while he or she was in the prone position handcuffed behind the back.

368.  No reasonable police officer would force a handcuffed detainee to remain in the prone position.

369.  No reasonable police officer would hogtie a detainee.

370.  No reasonable police officer would apply substantial or significant pressure causing asphyxiating conditions upon a hogtied detainee.

371.  Defendant HALEY BIANUCCI, who was at all material times acting under color of law and within the scope of her employment as a police officer for Michigan Technological University's Department of Public Safety, actively participated in the application of excessive force by applying significant pressure causing asphyxiating conditions as she placed the decedent in leg irons while he was handcuffed behind the back, laying in the prone position, as other officers likewise applied substantial or significant pressure causing him to suffer from asphyxiating conditions.

372.  Defendant BLAKE FRANTTI, who was at all material times acting under color of law and within the scope of his employment as

a Houghton County deputy, actively participated in the application of excessive force by transporting the decedent to the hospital in the prone position while he was handcuffed behind his back in leg irons.

373.  The decedent, BENJAMIN WALBY, suffered from excessive force and a deprivation of his clearly established constitutional rights as a result of the excessive force applied by Defendants HALEY BIANUCCI and BLAKE FRANTTI that directly and proximately caused him to be exposed to asphyxiating conditions that caused his death, as well as physical and emotional injury before his demise.

374.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants HALEY BIANUCCI and BLAKE FRANTTI's unconstitutional actions.

375. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants HALEY BIANUCCI and BLAKE FRANTTI's actions that include but are not necessarily limited to:

> a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,
>
> b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the

      intervening time between his initial injuries until his death,

   c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

   d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

   e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

376. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

377. WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants HALEY BIANUCCI and BLAKE FRANTTI in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT VIII – FAILURE TO INTERVENE ALL INDIVIDUAL DEFENDANTS

378.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

379.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI each owed a constitutional duty to BENJAMIN WALBY to protect him from the use of excessive force.

380.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI each observed or had reason to know that excessive force was or would be used.

381.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI each participated in

the use of excessive force as alleged in the factual section of this complaint.

382.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI had an opportunity and the means to prevent the use of excessive force from being applied to BENJAMIN WALBY.

383.  Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI, failed to intervene to protect the decedent from the unconstitutional use of excessive force.

384.  As a result of Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI's failure to intervene, excessive force was used upon BENJAMIN WALBY.

385.  The decedent, BENJAMIN WALBY, suffered a deprivation of his constitutional rights, and physical and emotional injury as a

direct and proximate result of the use of excessive force by the defendants' direct actions and their failure to prevent the unconstitutional actions of the other defendants that caused or contributed to his demise.

386. BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI's unconstitutional actions.

387. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI that include but are not necessarily limited to:

> a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,
>
> b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the

intervening time between his initial injuries until his death,

c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

388. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI in some amount in

105

excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT IX -- DELIBERATE INDIFFERENCE AS TO ALL INDIVIDUAL DEFENDANTS FOR DETAINING BENJAMIN WALBY IN THE PRONE POSITION WHILE SUFFERING FROM A SERIOUS MEDICAL CONDTION

389.   Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

390.   Plaintiff's decedent, BENJAMIN WALBY, had a clearly established right as a detainee to medical care pursuant to the Fourteenth Amendment to the United States Constitution.

391.   It was readily apparent to any person that the decedent had a serious medical need because he was bleeding and had lacerations over his body.

392.   The deliberate indifference occurred during the restraint positioning of Mr. Walby when he showed clear signs of distress and in need of being placed into a recovery position as he was visibly air hungry and needed oxygen rich blood to his brain and lungs.

393. Each previous count detailing force also required intervention to his serious medical needs to which all individual officers were deliberately indifferent.

394. All individual defendants immediately recognized the serious medical need and summoned an ambulance.

395. Despite summoning an ambulance to transport the decedent to the hospital, defendants did not permit paramedics to provide treatment to BENJAMIN WALBY.

396. Instead of seeking immediate medical attention, the individual defendants either actively held the decedent to the ground while he was hogtied, handcuffed behind the back, and in the prone position while applying substantial or significant pressure to the decedent's back for a prolonged period of time causing asphyxiating conditions; or, directed, supervised or observed the decedent being held to the ground, hogtied, handcuffed behind his back, and in the prone position while other officers applied substantial or significant pressure on the decedent's back for a prolonged period of time causing asphyxiating conditions.

397.  Any reasonable police officer is aware by way of policy or training that positional asphyxia is a serious medical condition capable of causing death.

398.  The individual defendants, deliberately indifferent to the BENJAMIN WALBY'S constitutional rights, failed to reposition the decedent and forced him to remain in the prone position, intentionally or recklessly ignoring his serious medical need as they observed him having difficulty breathing and attempting to self-relieve the pressure on his chest.

399. BENJAMIN WALBY had a clearly established constitutional right to be provided medical attention and to be re-positioned that the individual defendants violated.

400.  The decedent, BENJAMIN WALBY, suffered a deprivation of his constitutional rights, and physical and emotional injury as a direct and proximate result of the defendants use of force, the failure to re-position him, their denial of medical attention and their failure to prevent the unconstitutional actions of the other defendants that caused or contributed to his demise.

401.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately

died as a direct and proximate result of Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI's unconstitutional actions.

402. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI that include but are not necessarily limited to:

    a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

    b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

    c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

    d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

403. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## **COUNT X - SUPERVISORY LIABILITY OF**
## **DEFENDANT SGT. JEREMY HILL**

404.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

405.  Defendant SGT. JEREMY HILL was the supervisor of Defendant JURMU.

406.  Defendant SGT. JEREMY HILL was required by the CITY OF HOUGHTON'S police policies and procedures to deescalate the situation when he arrived at the scene of the incident and ensure that unreasonable or excessive force was not being applied to BENJAMIN WALBY.

407.  Defendant HILL was aware of the excessive force and deliberate indifference to the decedent's medical needs and authorized, approved, and/or acquiesced to its continuation by actively participating in the use of excessive force by causing asphyxiating pressure to be applied to BENJAMIN WALBY before, during, and after the handcuffing and hog tying of the decedent, while he laY in the prone position on the ground

408.   The decedent, BENJAMIN WALBY, suffered a deprivation of his constitutional rights, and physical and emotional injury as a direct and proximate result of the use of excessive force by the defendants' direct actions and their failure to prevent the unconstitutional actions of the other defendants that caused or contributed to his demise.

409.   BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendant SGT. JEREMY HILL's unconstitutional individual and supervisory actions.

410. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by SGT. JEREMY HILL that include but are not necessarily limited to:

      a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

      b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

      c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

    d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

    e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

411. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendant SGT. JEREMY HILL in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT XI - MUNICIPAL LIABILITY OF DEFENDANT CITY OF HANCOCK

412. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

413.  Defendant CITY OF HANCOCK had an official policy that permitted its officers to use the same level of force upon a person who was not suspected of committing a crime and was suffering from a mental illness as a person being arrested for a crime.

414.  Defendant CITY OF HANCOCK's policy permitted its officers to use force upon persons suffering from a mental illness before using deescalation techniques.

415.  Defendant CITY OF HANCOCK thereby trained its officers to use excessive force when they encountered individuals suffering from mental illness.

416. Had Defendant CITY OF HANCOCK enacted a constitutional policy that required its officers to use deescalation techniques when encountering a person suffering mental illness and properly trained and supervised its officers, Defendant SCOTT WUEBBEN would have taken action to determine whether BENJAMIN WALBY was suffering from mental illness, determined that it was likely that he was suffering from a mental illness, sought appropriate resources and used deescalation techniques including taking no action and monitoring the situation before resorting to force.

114

417. Rather than using deescalation techniques, Defendant WUEBBEN escalated the situation by drawing his taser and engaging in the unconstitutional actions described within the factual section of this complaint.

418. Defendant WUEBBEN used excessive force upon BENJAMIN WALBY as a direct and proximate result of Defendant CITY OF HANCOCK's unconstitutional policy because it is well known that persons suffering from mental illness are more likely to have force used against them than other detainees and that the level of force used upon those suffering from mental illness is more likely to be higher than upon other detainees.

419. Defendant CITY OF HANCOCK had a constitutional duty to train and supervise its officers in crisis intervention and to supervise their officers' actions because it was foreseeable to Defendant CITY OF HANCOCK that its officers would use excessive force upon the mentally ill.

420. Defendant CITY OF HANCOCK failed to train and supervise its officers in crisis intervention.

421.  It was known or obvious to Defendant CITY OF HANCOCK that the failure to train and supervise its officers in crisis intervention would result in excessive force being applied to the mentally ill.

422.  Despite being aware of the risk of excessive force being used upon the mentally ill, Defendant CITY OF HANCOCK failed to train and supervise its officers in proper crisis intervention technique when a high number of Hancock Police encounters involve interaction with the mentally ill.

423.  Defendant CITY OF HANCOCK'S failure to train and supervise its officers in crisis intervention rises to the level of deliberate indifference to the rights of the mentally ill.

424.  Defendant CITY OF HANCOCK's failure to train and supervise its officers has resulted in them repeatedly failing to deescalate and use excessive force upon individuals with mental illness such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the CITY OF HANCOCOK.

425.   Furthermore, in this matter, the CITY OF HANCOCK failed to review and discipline its officer, demonstrating its continued tolerance of unconstitutional behavior by its officers.

426.   Had Defendant CITY OF HANCOCK properly trained and supervised its officers in crisis intervention; Defendant SCOTT WUEBBEN would have known that he was obligated to deescalate before using force and unconstitutional and excessive force would not have been used upon BENJAMIN WALBY.

427.   Defendant CITY OF HANCOCK also maintained an unconstitutional policy that allowed its officers to use ECW's for the purpose of accomplishing any lawful arrest, which permitted its officers to use a taser even when the officer had no reasonable fear of danger to himself, herself, or others.

428.   Defendant CITY OF HANCOCK thereby unconstitutionally trained its officers that it is permissible to use a taser for non-compliance, flight, and in situations where the officer had no reason to believe that an officer or others were in danger.

429.   Such a use of force is excessive and unconstitutional.

430.   Had Defendant CITY OF HANCOCK enacted a constitutional policy and properly trained and supervised its officers

that tasers may only be used if the officer has a reasonable fear of danger to himself, herself, or others, and instructed its officers in proper usage as otherwise stated in this complaint, Defendant SCOTT WUEBBEN would have known that taser usage upon BENAJAMIN WALBY was improper.

431.  Defendant SCOTT WUEBBEN used excessive force when he tased BENJAMIN WALBY for flight and lack of compliance and as otherwise stated in this complaint as a direct and proximate result of Defendant CITY OF HANCOCK's unconstitutional policy.

432.  Defendant CITY OF HANCOCK had a constitutional duty to train and supervise its officers in using electronic control weapons to prevent their officers from using excessive force with a taser.

433.  Defendant CITY OF HANCOCK failed to adequately train and supervise its officers in proper taser usage, and, upon information and belief, Defendant SCOTT WUEBBEN was not trained in taser usage by a certified instructor.

434.  It was known or obvious to Defendant CITY OF HANCOCK that the failure to train and supervise its officers in the proper use of a taser would result in excessive force, injury, and death to persons subjected to them.

435. Despite being aware of the risk of excessive force being used with a taser and knowing of the risk of injury and death from taser usage, Defendant CITY OF HANCOCK failed to train and supervise its officers in the proper use of electronic control weapons.

436. Defendant CITY OF HANCOCK's failure to train and supervise its officers in the use of electronic control weapons rises to the level of deliberate indifference.

437. Defendant CITY OF HANCOCK's failure to train and supervise its officers has resulted in them repeatedly using tasers in an unconstitutional manner, such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the CITY OF HANCOCOK.

438. Furthermore, in this matter, the CITY OF HANCOCK failed to review and discipline its officer, demonstrating its continued tolerance of unconstitutional behavior by its officers.

439. Defendant CITY OF HANCOCK had a constitutional duty to train and supervise its officers in taser usage because it was foreseeable to Defendant CITY OF HANCOCK that its officers would use excessive force with a taser and cause injury or death to persons.

119

440.  Had Defendant CITY OF HANCOCK properly trained and supervised its officers in taser usage; unconstitutional and excessive force would not have been used upon BENJAMIN WALBY.

441.  Because Defendant SCOTT WUEBBEN was improperly trained and supervised, he used excessive force upon BENJAMIN WALBY when he tased him for flight and lack of compliance and as otherwise stated in this complaint as a direct and proximate result of Defendant CITY OF HANCOCK's unconstitutional policy.

442.  Upon information and belief and based upon documents provided by the CITY OF HANCOCK, Defendant CITY OF HANCOCK had an official policy or custom that unconstitutionally allowed its officers to hogtie mentally ill persons and hold them in the prone position while applying substantial or significant force.

443.  Defendant CITY OF HANCOCK thereby trained its officers in the unconstitutional use of excessive force.

444. Had Defendant CITY OF HANCOCK enacted a constitutional policy and properly trained and supervised its officers in constitutional restraint techniques; Defendant SCOTT WUEBBEN would have known not to hogtie and position BENJAMIN WALBY on

his stomach and apply significant or substantial pressure to his backside because of the risk of asphyxia.

445.  Defendant CITY OF HANCOCK had a constitutional duty to train and supervise its officers regarding how to properly position detainees to prevent asphyxia.

446.  Defendant CITY OF HANCOCK failed to adequately train and supervise its officers in how to properly position detainees to prevent asphyxia.

447.  It was known or obvious to Defendant CITY OF HANCOCK that the failure to train and supervise its officers in how to properly position detainees to prevent asphyxia would result in excessive force, injury, and death to persons subjected to them.

448.  Despite being aware of the risk of excessive force being used, and injury and death resulting from failing to train and supervise its officers regarding how to properly position detainees to prevent asphyxia, Defendant CITY OF HANCOCK failed to train and supervise its officers in proper positioning.

449.  Defendant CITY OF HANCOCK's failure to train and supervise its officers in how to properly position detainees to prevent asphyxia rises to the level of deliberate indifference.

121

450. Defendant CITY OF HANCOCK's failure to train and supervise its officers has resulted in them repeatedly placing individuals in an unlawful and dangerous position that rises to the level of excessive force, such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the CITY OF HANCOCOK.

451.  Furthermore, in this matter, the CITY OF HANCOCK failed to review and discipline its officer, demonstrating its continued tolerance of unconstitutional behavior by its officers.

452.  Defendant CITY OF HANCOCK had a constitutional duty to train and supervise its officers in how to properly position detainees to prevent asphyxia because it was foreseeable to Defendant CITY OF HANCOCK that its officers would use excessive force by improperly positioning detainees and cause injury or death to such persons.

453.  Had Defendant CITY OF HANCOCK properly trained and supervised its officers in how to properly position detainees to prevent asphyxia, Defendant SCOTT WUEBBEN would have known that allowing BENJAMIN WALYB to be hogtied and on his stomach for a

prolonged period of time was unconstitutional and he would have been properly positioned.

454.  Because Defendant SCOTT WUEBBEN was improperly trained and supervised in how to properly position detainees to prevent asphyxia, he used excessive force upon BENJAMIN WALBY when he allowed him to be hogtied and detained on his stomach with significant and substantial pressure being applied to his backside and as otherwise stated in this complaint as a direct and proximate result of Defendant CITY OF HANCOCK's unconstitutional policy.

455.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendant CITY OF HANCOCK's unconstitutional policies that permitted him to be excessively tased and held under asphyxiating conditions for a prolonged period of time without medical intervention.

456. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendant CITY OF HANCOCK that include but are not necessarily limited to:

       a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendant CITY OF HANCOCK in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT XII – MUNICIPAL LIABILITY OF DEFENDANT CITY OF HOUGHTON

457.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

458.  Defendant CITY OF HOUGHTON had a constitutional duty to train and supervise its officers in crisis intervention and to supervise their officers' actions because it was foreseeable to Defendant CITY OF HOUGHTON that its officers would use excessive force upon the mentally ill.

459.  Defendant CITY OF HOUGHTON failed to train and supervise its officers in crisis intervention, as evidenced, in part, by supervisor SGT. JEREMY HILL's failure to deescalate and stop the use of force when he arrived at the scene of the detention of BENJAMIN WALBY.

460.  It was known or obvious to Defendant CITY OF HOUGHTON that the failure to train and supervise its officers in crisis intervention would result in excessive force being applied to the mentally ill.

125

461.  Despite being aware of the risk of excessive force being used upon the mentally ill, Defendant CITY OF HOUGHTON failed to train and supervise its officers in proper crisis intervention technique when a high number of Hancock Police encounters involve interaction with the mentally ill.

462.  Defendant CITY OF HOUGHTON's failure to train and supervise its officers in crisis intervention rises to the level of deliberate indifference to the rights of the mentally ill.

463.  Defendant CITY OF HOUGHTON's failure to train and supervise its officers has resulted in them repeatedly failing to deescalate and use excessive force upon individuals with mental illness such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the CITY OF HANCOCOK.

464.  Furthermore, in this matter, the CITY OF HOUGHTON failed to review and discipline its officers, demonstrating its continued tolerance of unconstitutional behavior by its officers.

465.  Had Defendant CITY OF HOUGHTON properly trained its officers in crisis intervention; Defendants JURMU and HILL would

have known that they were obligated to deescalate before using force and unconstitutional and excessive force would not have been used upon BENJAMIN WALBY.

466.  Defendant CITY OF HOUGHTON had a constitutional duty to train and supervise its officers in using electronic control weapons to prevent their officers from using excessive force with a taser.

467.  Defendant CITY OF HOUGHTON failed to adequately train and supervise its officers in proper taser usage, and, upon information and belief, Defendant SCOTT WUEBBEN was not trained in taser usage by a certified instructor.

468. It was known or obvious to Defendant CITY OF HOUGHTON that the failure to train and supervise its officers in the proper use of a taser would result in excessive force, injury, and death to persons subjected to them.

469.  Despite being aware of the risk of excessive force being used with a taser and knowing of the risk of injury and death from taser usage, Defendant CITY OF HOUGHTON failed to train and supervise its officers in the proper use of electronic control weapons.

470. Defendant CITY OF HOUGHTON's failure to train and supervise its officers in the use of electronic control weapons rises to the level of deliberate indifference.

Defendant CITY OF HOUGHTON's failure to train and supervise its officers has resulted in them repeatedly using tasers in an unconstitutional manner, such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the CITY OF HOUGHTON.

471. Furthermore, in this matter, the CITY OF HOUGHTON failed to review and discipline its officers, demonstrating its continued tolerance of unconstitutional behavior by its officers.

472. Defendant CITY OF HOUGHTON had a constitutional duty to train and supervise its officers in taser usage because it was foreseeable to Defendant CITY OF HOUGHTON that its officers would use excessive force with a taser and cause injury or death to persons.

473. Had Defendant CITY OF HOUGHTON properly trained and supervised its officers in taser usage; unconstitutional and excessive force would not have been used upon BENJAMIN WALBY.

128

474.  Because Defendant ALAN JURMU was improperly trained and supervised, he used excessive force upon BENJAMIN WALBY when he tased him for flight and lack of compliance and as otherwise stated in this complaint as a direct and proximate result of Defendant CITY OF HOUGHTON's unconstitutional policy.

475.  Upon information and belief and based upon documents provided by the CITY OF HOUGHTON, Defendant CITY OF HOUGHTON had an official policy or custom that unconstitutionally allowed its officers to hogtie mentally ill persons and hold them in the prone position while applying substantial or significant force.

476.  Defendant CITY OF HOUGHTON thereby trained its officers in the unconstitutional use of excessive force.

477.  Had Defendant CITY OF HOUGHTON enacted a constitutional policy and properly trained and supervised its officers in constitutional restraint techniques; Defendants ALAN JURMU and JEREMY HILL would have known not to hogtie and position BENJAMIN WALBY on his stomach and apply significant or substantial pressure to his backside because of the risk of asphyxia.

478.   Defendant CITY OF HOUGHTON had a constitutional duty to train and supervise its officers regarding how to properly position detainees to prevent asphyxia.

479.   Defendant CITY OF HOUGHTON failed to adequately train and supervise its officers in how to properly position detainees to prevent asphyxia.

480.   It was known or obvious to Defendant CITY OF HOUGHTON that the failure to train and supervise its officers in how to properly position detainees to prevent asphyxia would result in excessive force, injury, and death to persons subjected to them.

481.   Despite being aware of the risk of excessive force being used, and injury and death resulting from failing to train and supervise its officers regarding how to properly position detainees to prevent asphyxia, Defendant CITY OF HOUGHTON failed to train and supervise its officers in proper positioning.

482.   Defendant CITY OF HOUGHTON's failure to train and supervise its officers in how to properly position detainees to prevent asphyxia rises to the level of deliberate indifference.

483.   Defendant CITY OF HOUGHTON's failure to train and supervise its officers has resulted in them repeatedly placing

individuals in an unlawful and dangerous position that rises to the level of excessive force, such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the CITY OF HANCOCOK.

484.  Furthermore, in this matter, the CITY OF HOUGHTON failed to review and discipline its officers, demonstrating its continued tolerance of unconstitutional behavior by its officers.

485.  Defendant CITY OF HOUGHTON had a constitutional duty to train and supervise its officers in how to properly position detainees to prevent asphyxia because it was foreseeable to Defendant CITY OF HANCOCK that its officers would use excessive force by improperly positioning detainees and cause injury or death to such persons.

486.  Had Defendant CITY OF HOUGHTON properly trained and supervised its officers in how to properly position detainees to prevent asphyxia, Defendants ALAN JURMU and JEREMY HILL would have known that allowing BENJAMIN WALYBY to be hogtied and on his stomach for a prolonged period of time was unconstitutional and he would have been properly positioned.

487.  Because Defendants ALAN JURMU and JEREMY HILL were improperly trained and supervised in how to properly position detainees to prevent asphyxia, they used excessive force upon BENJAMIN WALBY when they allowed him to be hogtied and detained on his stomach with significant and substantial pressure being applied to his backside and as otherwise stated in this complaint as a direct and proximate result of Defendant CITY OF HOUGHTON's unconstitutional policy.

488.  BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendant CITY OF HOUGHTON's unconstitutional policies that permitted him to be excessively tased and held under asphyxiating conditions for a prolonged period of time without medical intervention.

489.  The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendant CITY OF HOUGHTON that include but are not necessarily limited to:

    a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

    b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the

intervening time between his initial injuries until his death,

c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendant CITY OF HOUGHTON in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## **COUNT XIII – LIABILITY OF HOUGHTON COUNTY**

490. Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

491. Upon information and belief, Defendant HOUGHTON COUNTY had an official policy that permitted its officers to use the same level of force upon a person who was not suspected of committing a crime and was suffering from a mental illness as a person being arrested for a crime.

492. Defendant HOUGHTON COUNTY's policy permitted its officers to use force upon persons suffering from a mental illness before using deescalation techniques.

493. Defendant HOUGHTON COUNTY thereby trained its officers to use excessive force when they encountered individuals suffering from mental illness.

494. Had Defendant HOUGHTON COUNTY enacted a constitutional policy that required its officers to use deescalation techniques when encountering a person suffering mental illness and properly trained and supervised its officers, its deputies would have taken action to determine whether BENJAMIN WALBY was suffering from mental illness, determined that it was likely that he was suffering from a mental illness, sought appropriate resources and used deescalation techniques including taking no action and monitoring the situation before resorting to force.

134

495.   Rather than using deescalation techniques, HOUGHTON COUNTY deputies escalated the situation by drawing their tasers and engaging in the unconstitutional actions described within the factual section of this complaint.

496.   HOUGHTON COUNTY deputies used excessive force upon BENJAMIN WALBY as a direct and proximate result of Defendant HOUGHTON COUNTY's unconstitutional policy because it is well known that persons suffering from mental illness are more likely to have force used against them than other detainees and that the level of force used upon those suffering from mental illness is more likely to be higher than upon other detainees.

497.  Defendant HOUGHTON COUNTY had a constitutional duty to train and supervise its officers in crisis intervention and to supervise their officers' actions because it was foreseeable to Defendant HOUGHTON COUNTY that its officers would use excessive force upon the mentally ill.

498.  Defendant HOUGHTON COUNTY failed to train and supervise its officers in crisis intervention.

499.  It was known or obvious to Defendant HOUGHTON COUNTY that the failure to train and supervise its officers in crisis

intervention would result in excessive force being applied to the mentally ill.

500.  Despite being aware of the risk of excessive force being used upon the mentally ill, Defendant HOUGHTON COUNTY failed to train and supervise its officers in proper crisis intervention technique when a high number of Hancock Police encounters involve interaction with the mentally ill.

501.  Defendant HOUGHTON COUNTY's failure to train and supervise its officers in crisis intervention rises to the level of deliberate indifference to the rights of the mentally ill.

502.  Defendant HOUGHTON COUNTY's failure to train and supervise its officers has resulted in them repeatedly failing to deescalate and use excessive force upon individuals with mental illness such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the HOUGHTON COUNTY.

503.  Furthermore, in this matter, the HOUGHTON COUNTY failed to review and discipline its officers, demonstrating its continued tolerance of unconstitutional behavior by its officers.

504.   Had Defendant HOUGHTON COUNTY properly trained its officers in crisis intervention; its deputies would have known that they were obligated to deescalate before using force and unconstitutional and excessive force would not have been used upon BENJAMIN WALBY.

505.  Defendant HOUGHTON COUNTY had a constitutional duty to train and supervise its officers in using electronic control weapons to prevent their officers from using excessive force with a taser.

506.  Defendant HOUGHTON COUNTY failed to adequately train and supervise its officers in proper taser usage, as evidenced by the continuous and systematic improper user of tasers described above that went unpunished and was ratified by HOUGHTON COUNTY.

507.  It was known or obvious to Defendant HOUGHTON COUNTY that the failure to train and supervise its officers in the proper use of a taser would result in excessive force, injury, and death to persons subjected to them.

508.  Despite being aware of the risk of excessive force being used with a taser and knowing of the risk of injury and death from

taser usage, Defendant HOUGHTON COUNTY failed to train and supervise its officers in the proper use of electronic control weapons.

509. Defendant HOUGHTON COUNTY's failure to train and supervise its officers in the use of electronic control weapons rises to the level of deliberate indifference.

510. Defendant HOUGHTON COUNTY's failure to train and supervise its officers has resulted in them repeatedly using tasers in an unconstitutional manner, such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the HOUGHTON COUNTY.

511. Furthermore, in this matter, the HOUGHTON COUNTY failed to review and discipline its officers, demonstrating its continued tolerance of unconstitutional behavior by its officers.

512. Defendant HOUGHTON COUNTY had a constitutional duty to train and supervise its officers in taser usage because it was foreseeable to Defendant HOUGHTON COUNTY that its officers would use excessive force with a taser and cause injury or death to persons.

513.  Had Defendant HOUGHTON COUNTY properly trained and supervised its officers in taser usage; unconstitutional and excessive force would not have been used upon BENJAMIN WALBY.

514.  Because HOUGHTON COUNTY deputies were improperly trained and supervised, they used excessive force upon BENJAMIN WALBY when they tased him for flight and lack of compliance and as otherwise stated in this complaint as a direct and proximate result of Defendant HOUGHTON COUNTY's unconstitutional policy.

515.  Upon information and belief and based upon documents provided by the HOUGHTON COUNTY, Defendant HOUGHTON COUNTY had an official policy or custom that unconstitutionally allowed its officers to hogtie mentally ill persons and hold them in the prone position while applying substantial or significant force.

516.  Defendant HOUGHTON COUNTY thereby trained its officers in the unconstitutional use of excessive force.

517.  Had Defendant HOUGHTON COUNTY enacted a constitutional policy and properly trained and supervised its officers in constitutional restraint techniques; HOUGHTON COUNTY deputies would have known not to hogtie and position BENJAMIN

WALBY on his stomach and apply significant or substantial pressure to his backside because of the risk of asphyxia.

518. Defendant HOUGHTON COUNTY had a constitutional duty to train and supervise its officers regarding how to properly position detainees to prevent asphyxia.

519. Defendant HOUGHTON COUNTY failed to adequately train and supervise its officers in how to properly position detainees to prevent asphyxia.

520. It was known or obvious to Defendant HOUGHTON COUNTY that the failure to train and supervise its officers in how to properly position detainees to prevent asphyxia would result in excessive force, injury, and death to persons subjected to them.

521. Despite being aware of the risk of excessive force being used, and injury and death resulting from failing to train and supervise its officers regarding how to properly position detainees to prevent asphyxia, Defendant HOUGHTON COUNTY failed to train and supervise its officers in proper positioning.

522. Defendant HOUGHTON COUNTY's failure to train and supervise its officers in how to properly position detainees to prevent asphyxia rises to the level of deliberate indifference.

140

523.  Defendant HOUGHTON COUNTY's failure to train and supervise its officers has resulted in them repeatedly placing individuals in an unlawful and dangerous position that rises to the level of excessive force, such that the repeated and historical use of excessive force has been established as a pattern or practice that the city has ratified, making the use of excessive force an accepted policy of the HOUGHTON COUNTY.

524.  Furthermore, in this matter, the HOUGHTON COUNTY failed to review and discipline its officers, demonstrating its continued tolerance of unconstitutional behavior by its officers.

525.  Defendant HOUGHTON COUNTY had a constitutional duty to train and supervise its officers in how to properly position detainees to prevent asphyxia because it was foreseeable to Defendant HOUGHTON COUNTY that its officers would use excessive force by improperly positioning detainees and cause injury or death to such persons.

526.  Had Defendant HOUGHTON COUNTY properly trained and supervised its officers in how to properly position detainees to prevent asphyxia, HOUGHTON COUNTY deputies would have known that allowing BENJAMIN WALYB to be hogtied and on his stomach

for a prolonged period of time was unconstitutional and he would have been properly positioned.

527.   Because HOUGHTON COUNTY deputies were improperly trained and supervised in how to properly position detainees to prevent asphyxia, they used excessive force upon BENJAMIN WALBY when they allowed him to be hogtied and detained on his stomach with significant and substantial pressure being applied to his backside and as otherwise stated in this complaint as a direct and proximate result of Defendant HOUGHTON COUNTY's unconstitutional policy.

528.   BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendant HOUGHTON COUNTY's unconstitutional policies that permitted him to be excessively tased and held under asphyxiating conditions for a prolonged period of time without medical intervention.

529. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendant HOUGHTON COUNTY that include but are not necessarily limited to:

a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendant HOUGHTON COUNTY in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT XIV - ASSAULT & BATTERY – DEFENDANTS SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, AND BLAKE FRANTTI

530.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

531.  Defendants WUEBBEN, JURMU, KINNUNEN, GRENTZ, DEKRYGER, KNOOP, HILL, POYHONEN, BIANUCCI, and FRANTTI, while acting within the scope of their employment at their respective departments, made intentional and unlawful threats or offers to do bodily injury to the decedent, BENJAMIN WALBY, under circumstances creating the well-founded fear of imminent peril, and displaying the ability to carry out the threat and/or carried out the threatened battery by willfully and intentionally applying excessive force against the decedent in the following manners:

    a. Tackling him to the ground,

    b. Repeatedly tasing him,

    c. Hog tying him,

    d. Holding him in the prone position for a prolonged period of time,

144

e. Causing asphyxiating conditions by pressing him toward the ground while he was in the prone position,

f. Threatening to tase him,

g. Shackling him,

h. Transporting him in the prone position, and

i. Any other manners discovered throughout the course of discovery.

532. The threats of battery or completed batteries were unwelcome, unlawful, unjustified, and against BENJAMIN WALBY's will.

533. The defendants' actions were intended to harm or were undertaken with such indifference to whether harm would result that they equaled a willingness that harm would result such that they were undertaken with malice or bad faith.

534. BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a direct and proximate result of Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK

POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI's unconstitutional actions.

535. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI that include but are not necessarily limited to:

      a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

      b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

      c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

      d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

      e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

536.  Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased, respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

## COUNT XV - GROSS NEGLIGENCE -- DEFENDANTS SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, AND BLAKE FRANTTI

537.  Plaintiff hereby re-alleges and incorporates individually, every numbered allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

538. Defendants WUEBBEN, JURMU, KINNUNEN, GRENTZ, DEKRYGER, KNOOP, HILL, POYHONEN, BIANUCCI, HASTREITER and FRANTTI owed the decedent, BENJAMIN WALBY, a duty to use ordinary care to ensure his safety and freedom from cruel and unusual punishment, including the specific harms alleged above.

539. Defendants breached their duties and were grossly negligent by willfully and wantonly subjecting the decedent to unlawful and excessive tasing and asphyxiating pressure as alleged above demonstrating a substantial lack of concern for whether injury or death would result.

540. BENJAMIN WALBY stopped breathing, went into cardiac arrest, suffered hypoxic ischemic encephalopathy, and ultimately died as a and/or the direct and proximate result of Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI's unconstitutional actions.

541. The ESTATE OF BENJAMIN WALBY is entitled to compensation for the injuries caused by Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ,

PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK

POYHONEN,  HALEY  BIANUCCI,  JENNIFER  HASTREITER,  and

BLAKE FRANTTI that include but are not necessarily limited to:

    a. Reasonable compensation for funeral, medical, and hospital expenses for which the estate is responsible,

    b. Reasonable compensation for the physical pain and suffering suffered by the decedent during the intervening time between his initial injuries until his death,

    c. Reasonable compensation for the mental anguish, fright and shock, embarrassment, humiliation and mortification suffered by the decedent during the intervening time between his initial injuries until his death,

    d. Loss of wages, future earning capacity, financial support, or other tangible items of economic value,

    e. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which the decedent's heirs-at-law and next-of-kin are respectfully entitled to, and any other damages as may be fair and just.

542. Plaintiff is entitled to punitive damages for the reckless and callous indifference exhibited by the defendants to the decedent's constitutional rights in addition to costs, interest, expert fees, and attorney fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

WHEREFORE, Plaintiff DAVID WALBY as Personal Representative of the ESTATE OF BENJAMIN WALBY, deceased,

respectfully requests entry of a judgment in favor of the estate and against Defendants SCOTT WUEBBEN, ALAN JURMU, NATHAN KINNUNEN, DYLAN GRENTZ, PETER DEKRYGER, BRADEN KNOOP, SGT. JEREMY HILL, BROCK POYHONEN, HALEY BIANUCCI, JENNIFER HASTREITER, and BLAKE FRANTTI in some amount in excess of Seventy-Five Thousand Dollars (>$75,000.00), exclusive of costs, interest, and attorney fees that are likewise demanded.

Respectfully submitted,

*/s/ Gary N. Felty, Jr.*

GARY N. FELTY, JR. (P55554)
JAMES J. HARRINGTON, IV (P65351)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorney for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
g.felty@fiegerlaw.com

Dated: January 12, 2026

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID WALBY as Personal
Representative of the ESTATE OF
BENJAMIN WALBY, deceased,                    Case No.:
                                             Hon.
        Plaintiff,

vs.

CITY OF HANCOCK,
CITY OF HOUGHTON,
HOUGHTON COUNTY,
SCOTT WUEBBEN,
ALAN JURMU,
NATHAN KINNUNEN,
DYLAN GRENTZ,
PETER DEKRYGER,
BRADEN KNOOP,
SGT. JEREMY HILL,
BROCK POYHONEN,
HALEY BIANUCCI,
JENNIFER HASTREITER, and
BLAKE FRANTTI,

        Defendants.
_____

JAMES J. HARRINGTON, IV (P65351)
GARY N. FELTY, JR. (P55554)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
Fax: (248) 355-5148
j.harrignton@fiegerlaw.com
g.felty@fiegerlaw.com
_____


**PLAINTIFF'S DEMAND FOR TRIAL BY JURY**


151

NOW COMES DAVID WALBY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN WALBY, DECEASED, by and through his attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and hereby requests trial by jury in this matter.

Respectfully submitted,

*/s/ Gary N. Felty, Jr.*

GARY N. FELTY, JR. (P55554)
JAMES J. HARRINGTON, IV (P65351)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorney for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
g.felty@fiegerlaw.com

Dated: January 12, 2026